A99A0758. DUMAS v. THE STATE.
(521 SE2d 108)

POPE, Presiding Judge.

Frederick Dumas was convicted on one count of aggravated sodomy. His motion for new trial, as amended, was denied, and he appeals.

1. Dumas contends the verdict was contrary to the evidence and against the weight of the evidence. In particular, he contends that the State did not show that the victim lacked the ability to consent to a sexual relationship with him or that he used force. We first note that this court views the evidence in the light most favorable to sup-

---

port the verdict, and an appellant "no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility. [Cit.]" *Johnson v. State*, 236 Ga. App. 61, 63 (1) (510 SE2d 918) (1999). So viewing the evidence, we have examined the record, and we conclude that the evidence was sufficient to enable a rational trier of fact to conclude that Dumas committed aggravated sodomy against the victim, a mentally retarded 22-year-old man.

2. Dumas contends the trial court erroneously permitted the victim to testify after finding that the victim did not understand the oath due to his incapacity.

At trial, relying on OCGA § 24-9-5, Dumas challenged the competency of the victim to testify, arguing that the victim did not have the use of reason and could not understand the oath because of his mental incapacity. OCGA § 24-9-5 provides as follows:

(a) Except as provided in subsection (b) of this Code section, persons who do not have the use of reason, such as idiots, lunatics during lunacy, and children who do not understand the nature of an oath, shall be incompetent witnesses.

(b) Notwithstanding the provisions of subsection (a) of this Code section . . . in criminal cases involving child molestation, and in all other criminal cases in which a child was a victim of or a witness to any crime, any such child shall be competent to testify, and his credibility shall be determined as provided in Article 4 of this chapter.

During the competency hearing, the prosecutor analogized the adult victim to a child because he allegedly functioned at the capacity of a seven-year-old, and the trial court apparently agreed with this characterization of the victim's mental abilities. The State argued that under the competency statute the victim was not required to understand the oath, rather he was required only to be able to reason. After hearing further argument, the trial court stated that the threshold issue for determination was whether the statute applied "as if he's a child or whether it applies as if he's an adult." The court then attempted to question the victim using the sister's assistance. After this initial examination, the court made the following ruling:

Based on the court's examination of [the victim] and his sister, it's clear to the court that [the victim] is not functioning as an adult. Clearly he may be an adult in terms of chronological age but he's not an adult. I believe, as I understand it, he functions about like a . . . six or seven-year-old. He's fairly non-verbal. . . . Based on what the court has

> observed, the court will allow the testimony of [the victim] through his sister or some other assistance through his mother for purposes of this trial. . . . I do not find that [the victim] has to understand the oath because of his obvious incapacity.

The court also concluded the victim had the ability to reason, because the victim obeyed his instructions to "come in," "sit down," and "get up." The court also noted that the victim followed the instructions of his sister when she said "come on, let's go."

Just prior to the victim's testimony Dumas again objected, contending that the victim was incompetent to testify as an adult. Dumas argued that under OCGA § 24-9-5, the victim was required "to understand the oath, and the difference between truth and falsity," as well as to have the ability to reason. Dumas argued alternatively that if the court believed the victim to be a child, the victim was nevertheless incompetent under OCGA § 24-9-5 (b), because he was unable to reason. The court reiterated its earlier ruling, stating that the victim could "testify particularly after the evidence has come in as to whether he has the ability to reason, although be it as a child." The court twice asked the victim, "Do you know how to tell the truth?" and the victim nodded his head. The court responded, "You do? Can you say 'yes' for me?" The victim answered, "[Y]es." The victim was then permitted to testify.

First, subsection (a) of OCGA § 24-9-5 says those who cannot reason are incompetent to testify. Here, at the competency hearing the court held that the victim had that ability. Dumas has not challenged that conclusion.

Second, pretermitting whether OCGA § 24-9-5 (b) applies to the mentally incompetent, the law has long recognized that mentally incompetent witnesses may testify if they meet the same standard that formerly applied to children, and the victim in this case met that standard. Before subsection (b) was added to OCGA § 24-9-5 in 1989, competency of the mentally impaired as witnesses was assessed by the same test as children, i.e., whether they understand the nature of the oath.

> A person who has been adjudged insane is not, in all cases, incompetent as a witness. His testimony is admissible if he has sufficient understanding to apprehend the obligations of an oath and to be capable of giving a correct account of the matters he has seen or heard in reference to the questions at issue.

*Cuesta v. Goldsmith*, 1 Ga. App. 48, hn. 3 (57 SE 983) (1907).[1]

> The rules governing courts in the admission of evidence of
> . . . one alleged to be . . . of insufficient mental capacity to
> understand the nature of an oath and appreciate its sanc-
> tity[ ] are analogous to those applicable to a case where tes-
> timony of a child is offered and objected to on the ground
> that the child, because of its tender years and the mental
> incapacity resulting therefrom, is incapable of understand-
> ing the nature of an oath. [Cits.]

*Langston v. State*, 153 Ga. 127, hn. 2 (111 SE 561) (1922).

Understanding the nature of the oath does not require a techni-
cal understanding of the oath, but rather a simple understanding of
truth and falsehood and the importance of telling the truth. As stated
in *Smith v. State*, 247 Ga. 511-512 (277 SE2d 53) (1981), understand-
ing the nature of an oath requires,

> not that he be able to define the meaning of an oath, nor
> that he understand the process under which the oath is
> administered, but rather that he know and appreciate the
> fact that as a witness he assumes a solemn and binding obli-
> gation to tell the truth relative to the case and concerning
> such matters as he may be interrogated on, and that if he
> violates the obligation he is subject to be punished by the
> court.

See also *Vaughn v. State*, 226 Ga. App. 318, 319 (1) (486 SE2d 607)
(1997) (witness understood difference between truth and falsehood
and the importance of telling the truth); *Lamunyon v. State*, 218 Ga.
App. 782, 783 (1) (463 SE2d 365) (1995) (witness could appreciate the
difference between truth and lie and appreciate obligation to tell the
truth); *Howard v. State*, 212 Ga. App. 298, 301 (3) (441 SE2d 759)
(1994) (witness knew what a promise was and that it was good to
keep a promise and bad to break it, and then she promised to tell the
truth); *Haslem v. State*, 160 Ga. App. 251, 252 (1) (286 SE2d 748)
(1981) (victim understood nature of oath and the charges against
defendant).

Everyone is presumed competent to testify, even people who
have been shown to have mental disabilities. *Flynn v. State*, 255 Ga.

---

[1] At the time of the decision in *Cuesta*, the statute on witness competency was essen-
tially the same as OCGA § 24-9-5 prior to 1989. Section 5273 of the Civil Code of 1895 pro-
vided, " 'Persons who have not the use of reason, as idiots, lunatics during lunacy, and chil-
dren who do not understand the nature of an oath, are incompetent witnesses.' " *Cuesta*, 1
Ga. App. at 52 (3).

415, 419 (7) (339 SE2d 259) (1986). Here, the trial court observed that the victim had the ability to reason. Before he testified, the victim indicated he knew how to tell the truth; his mother testified he knew the difference between right and wrong and he had the ability to reason; and his sister testified he could distinguish between right and wrong and is remorseful when wrong. The mother and sister were authorized to testify regarding the victim's competency. OCGA § 24-9-7 (b). This evidence was sufficient to show that the victim had an appreciation for the truth. "A trial court's ruling will be affirmed if it is right for any reason." (Citations and punctuation omitted). *Lewis v. State*, 233 Ga. App. 560, 562 (2) (504 SE2d 732) (1998).

3. Dumas contends the trial court erroneously admitted evidence of similar transactions. Following a Uniform Superior Court Rule 31.3 hearing, the trial court permitted the State to introduce evidence of three similar transactions. The first involved the alleged molestation of Dumas's niece. Dumas's sister testified that in 1977, her then seven-year-old daughter told her that Dumas had placed his finger in her bottom. Although Dumas's sister reported this alleged incident to the authorities, she eventually dropped the charges at the request of their mother.

Another of Dumas's sisters testified that she and Dumas were living with their mother in 1978, and she returned home from work to find the house locked. She knocked on the door and asked "Nookie" to let her in. Dumas told her he was coming to the door, but the witness testified she stood at the door for five minutes, and she threatened to "bust the window pane if you don't come to the door." When Dumas finally opened the door, the witness saw "a little child . . . coming out the door." The child "acted like she was real scared and . . . she was looking real wild. Her little eyes, you know, she had bugged out little eyes." The child was unable to talk, apparently because of her fear, according to the witness. The child did, however, point out to the witness where she lived. Thinking that Dumas had raped the child, the witness took her home and told her mother to take her to the hospital. Dumas was prosecuted for this offense. The State introduced a certified copy of an indictment, charging him with child molestation. Dumas pled guilty to "placing his sex organ on and against the sex organ of the child on or around January 4, 1979."

The third transaction involved a 38-year-old victim. Officer Gordon Earls with the Atlanta Police Department testified that he investigated a call in April 1988 by a woman who stated she had been raped by Dumas. The victim's lip was cut, and she had two "knots" on her head, according to Earls. The State introduced a certified copy of an indictment charging Dumas with rape, but Dumas pled guilty to a lesser-included offense of aggravated assault with intent to rape. Dumas testified that he gave this victim money for

sex, and when she then refused to have sex with him, they began fighting. He admitted telling the victim, "You're either going to do something or we're going to fight."

Before evidence of similar transactions may be admitted, the State must make three affirmative showings as to each transaction. The State must show that the evidence is being used for a permissible purpose, that sufficient evidence shows the accused to have been the perpetrator of the similar transaction, and that sufficient similarity exists between the transaction and the crime for which the accused is on trial, such that proof of the former tends to prove the latter. *Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991). This exception to the general rule concerning the admission of evidence of independent offenses "has been most liberally extended in the area of sexual offenses." (Citation and punctuation omitted.) *Stine v. State*, 199 Ga. App. 898, 899 (2) (406 SE2d 292) (1991).

With respect to the child molestation charge initiated after Dumas's sister discovered the frightened seven-year-old girl and the aggravated assault charge, we find no error in the admission of these transactions. The State introduced all of the similar transactions to show Dumas's state of mind, a permissible purpose. See, e.g., *McCormick v. State*, 228 Ga. App. 467, 468 (5) (491 SE2d 903) (1997). The testimony of Dumas's sister was sufficient evidence to show that he was the perpetrator of the offense against the child, and his own testimony showed his involvement in the aggravated assault of the adult woman. As for the third showing the State was required to make, a sufficient similarity between the prior offenses and the one for which Dumas was on trial, the prior child molestation charge demonstrated Dumas's tendency to sexually assault individuals of limited mental capacity.

Although the similarity of the aggravated assault against the adult woman to the sexual assault against the victim in this case is not as clear, some similarity and relevance exist, as Dumas's conduct during the former incident showed his tendency to use force in an effort to engage in sexual contact with a victim. Even if the trial court did not make explicit findings on the record that each of these requirements was met, no harmful error occurred, because the evidence was sufficient to show that the *Williams* requirements were satisfied. See *Byrd v. State*, 236 Ga. App. 485, 489 (6) (d) (512 SE2d 372) (1999). Moreover, it is clear in this case that the relevancy of these similar transactions outweighed any prejudice that their admission may have occasioned. "Such evidence is particularly relevant and needed, where the victim of . . . sexual abuse is mentally retarded." *Payne v. State*, 207 Ga. App. 312, 316 (2) (428 SE2d 103) (1993), overruled on other grounds, *Sims v. State*, 266 Ga. 417, 418 (2) (467 SE2d 574) (1996). "Absent an abuse of discretion, we will not

disturb a trial court's determination that similar transaction evidence is admissible. [Cit.] We find no such abuse here." *Arnold v. State,* 236 Ga. App. 380, 382 (2) (511 SE2d 219) (1999).

With regard to the incident involving Dumas's niece, Dumas argues there was no indictment or conviction, the testimony was introduced through someone other than the victim, and the court failed to make the three required findings. We conclude that any possible error was harmless. Appellate courts must assess harm as well as error when similar transaction evidence has been improperly admitted. *White v. State,* 269 Ga. 74, 75 (2) (495 SE2d 278) (1998); *Jones v. State,* 226 Ga. App. 721, 724 (1) (487 SE2d 618) (1997). The error is harmless when it is highly probable the error did not contribute to the judgment. *White,* 269 Ga. at 75 (2); *Johnson v. State,* 238 Ga. 59, 61 (230 SE2d 869) (1976).

Here, the victim demonstrated for the jury what Dumas did to him. The victim's sister identified Dumas as the person to whom she entrusted the victim; the victim and Dumas were missing for over an hour and a half; when the victim was found, the sister observed evidence of the assault on the victim and she noted that his underwear was missing; and she found the victim's underwear the next day in some bushes. Given this evidence and the other two similar transactions, it is highly probable that any error introducing the incident with the niece did not contribute to the judgment. See *Sweet v. State,* 237 Ga. App. 613, 616 (2) (516 SE2d 317) (1999) (similar transaction evidence of prior molestation was harmless when only evidence against defendant was three-year-old child told mother and social worker that defendant had molested her, and mother saw some physical evidence on child).

Dumas suggests the State presented a fourth similar transaction regarding Rosemary Dumas's daughter. It does not appear, however, that evidence of this incident was introduced at trial. To the extent that evidence regarding the transaction was arguably inquired into by the State on cross-examination of Dumas, Dumas raised no objection at trial.

4. Dumas contends the trial court erroneously charged the jury concerning the use of similar transactions. The trial court, however, instructed the jury that evidence concerning the similar transactions was admissible "for the sole issue or purpose to which the evidence is limited and not for any other purpose" and that evidence of similar transactions was admissible, among other reasons, to show "the identity of the perpetrator, the state of mind, i.e., depraved state of mind, lustful disposition, knowledge or intent of the defendant in the crime charged in the case now on trial." The court went on to state that if the jury believed Dumas committed the similar transactions, it would "be strictly limited in [its] consideration of the evidence as to

the identity of the defendant or to his state of mind as relates to an element of the offense charged in the indictment." Considering this charge as a whole, we conclude that the jury was properly instructed on the law of similar transactions, and we find no error. See generally *Barnes v. State*, 191 Ga. App. 424, 426 (2) (382 SE2d 164) (1989).

5. Dumas contends he was denied his right to cross-examine the victim because the trial court permitted the victim to testify "through" his mother. During the victim's competency hearing, the court ruled that it would permit the victim's testimony "through his sister or some other assistance through his mother for purposes of this trial."

We might be inclined to agree with Dumas that he was denied his right to confront the victim if, indeed, the mother or sister interpreted for the jury unintelligible statements or communications by the victim, particularly if they interpreted the victim's language as meaning that Dumas committed the crime against him. This did not occur, however. During the pre-trial hearing, the court also ruled that it would not permit the mother or sister to "make up testimony."[2] At trial, upon further argument by Dumas, the prosecutor contended that the mother should be permitted "to be present with the 'victim' and . . . help maintain his calm and composure." The court then asked the victim a series of questions, and the victim made clear responses in the English language.

A short time later, after the victim demonstrated his ability to follow the instructions of his mother to make a sandwich and say grace, the prosecutor asked his mother to "begin to identify him." The mother asked the victim, "Who are you?" and gave him simple commands to talk into the microphone. The mother then asked whether the victim knew Nookie, and the victim responded affirmatively. After the prosecutor asked whether the victim saw Nookie in the courtroom, the mother instructed the victim to answer the question. The prosecutor instructed the victim to "[p]oint at Nookie" and asked what Nookie did to him. The mother told the victim that it was "all right to tell him." At the prosecutor's request to show what Nookie did to him, the victim stood and, according to the transcript, indicated to the jury what occurred. The prosecutor then asked the mother to look away while he asked the victim to pick out Nookie's photograph. The record reflects that the victim chose a photograph of Dumas from a series of photographs.

Defense counsel was then allowed to cross-examine the victim. At defense counsel's request, the mother asked the victim if he could

---

[2] The court also stated, "I will not allow, if [the prosecutor] asks where were you on June 5th and they come back, yes, the defendant did it. . . . That's not going to be admitted."

ask the victim any questions, and the victim responded affirmatively. Throughout cross-examination, defense counsel asked some questions to which he received no response. But at other times during cross-examination, the victim would answer when instructed by his mother to "answer yes or no." After defense counsel finished questioning the witness, he moved for mistrial, claiming that he "did not receive the assistance from the mother . . . as the State did." This contention is belied by the record, however, as the mother instructed the victim several times to answer counsel's questions, and the court aptly noted that "[i]f during your examination you weren't getting the assistance you needed, if you had brought it to the attention of the court, I could have corrected it."

Under the facts of this case, we find no violation of Dumas's right to confront the victim. Dumas was given the opportunity to cross-examine the victim and chose to use the mother's assistance during the victim's testimony. Furthermore, the mother in no manner "interpreted" or "explained" the victim's responses, which could have presented a constitutional violation, depending on the mother's statements. Moreover, the fact that the victim was often unresponsive was not an abridgement of Dumas's Sixth Amendment rights. The victim's

> silence itself was evidence, as the jury could observe [his] demeanor as each question was posed. A witness' responsiveness or unresponsiveness, evasiveness or directness, verbal skills, intelligence, memory, perception, and apparent understanding are all factors which can be assessed by the jury and may raise a reasonable doubt.

*Bright v. State*, 197 Ga. App. 784, 786 (400 SE2d 18) (1990).[3] Dumas was given full and fair opportunity to cross-examine the victim in this case.

6. With regard to Dumas's assertion that his character was wrongly placed in issue, Dumas waived consideration of the denial of his motion for mistrial because he failed to renew the motion after the court gave curative instructions. *Ford v. State*, 269 Ga. 139, 141 (3) (498 SE2d 58) (1998). With regard to the testimony about Dumas's sexual preference, although the response that he likes "both ways" may have put his character in issue, Dumas failed to object on these grounds at trial. *Hagger v. State*, 179 Ga. App. 16 (2) (345 SE2d 118) (1986). Further, the comment was not evidence of a similar

---

[3] Although *Bright* involves the application of OCGA § 24-9-5 (b), as noted by the State in its appellate brief, "the analysis applied in [*Bright*] is helpful to the resolution of [the] issue of whether appellant's right to confrontation was violated."

transaction but only a comment on sexual preference.

*Judgment affirmed. Johnson, C. J., Blackburn, P. J., and Elling-*
*ton, J., concur. Eldridge, J., concurs and concurs specially. Smith, J.,*
*concurs as to Divisions 1, 4, 5 and 6 and concurs in part and dissents*
*in part as to Division 3 and dissents as to Division 2. Barnes, J., con-*
*curs as to Divisions 1, 2, 4, 5 and 6 and concurs in part and dissents*
*in part as to Division 3.*

ELDRIDGE, Judge, concurring specially.

I concur fully in the opinion of the majority. I write separately because of my concern that the proper standard for the admission of outcry testimony be maintained.

Contrary to the position of the dissent, a child's outcry need not be made "immediately after the sexual assault" in order for such evidence to be admissible at trial. That has not been the law since 1986, when OCGA § 24-3-16, the Georgia Child Hearsay Statute, was enacted. See Ga. L. 1986, p. 668, § 1. Such evidence is not "res gestae" evidence. The amount of time between improper sexual contact and outcry may be *one* aspect a trial court looks at in order to determine "indicia of reliability" for the admission of outcry testimony pursuant to OCGA § 24-3-16, but it is by no means dispositive. *Medina v. State*, 234 Ga. App. 13, 14 (505 SE2d 558) (1998); *Wells v. State*, 222 Ga. App. 587, 588 (2) (474 SE2d 764) (1996); *Gregg v. State*, 201 Ga. App. 238, 239 (3) (411 SE2d 65) (1991).

SMITH, Judge, concurring in part and dissenting in part.

Although I concur with the remainder of the majority opinion, I respectfully dissent as to Division 2, and I dissent in part to Division 3.

1. I do not agree that the victim in this case was shown to be competent within the meaning of OCGA § 24-9-5 (a). That statute requires "that the witness has sufficient understanding to receive, remember and narrate impressions and is sensible of the obligation to tell the truth. [Cit.]" *Ambles v. State*, 259 Ga. 406, 409 (2) (b) (383 SE2d 555) (1989). See also *Dorsey v. State*, 206 Ga. App. 709, 713 (3) (426 SE2d 224) (1992) (physical precedent only) (witness competent where he or she understands obligation to tell truth and can give material evidence concerning subject matter at issue).

Although the competency statute contains only minimal requirements concerning whether a witness is competent to testify, those requirements were not met in this case. While the victim indicated to the court that he knew what it meant to tell the truth, nothing in the trial court's examination of the victim or the record itself shows that the victim understood the difference between truth and falsehood. Compare *Vaughn v. State*, 226 Ga. App. 318, 319 (1) (486 SE2d 607)

(1997) (victim demonstrated her understanding of the difference between truth and falsehood and importance of telling the truth). While the victim may well have been capable of meeting the requirements of the statute, his competence was not adequately demonstrated below. Had the trial court simply also asked the victim whether he knew what it meant to tell a lie or to tell a falsehood and the consequence of not being truthful under oath, I might well be able to agree that his competence was adequately shown.

2. I agree with the majority that the similar transaction evidence involving the child molestation charge initiated by defendant's sister after discovering the seven-year-old neighbor girl was properly admitted, as was the evidence concerning the incident with the adult woman. I do not agree, however, that the trial court correctly admitted the similar transaction testimony involving Dumas's niece. The alleged victim herself, aged 24 at the time of trial, did not testify. Instead, her mother testified as to what the then seven-year-old victim reported to her, and she did so without any showing that the child made the outcry immediately after the alleged sexual assault. It therefore was not shown that the outcry might have been admissible as part of the res gestae. See generally *Tucker v. State*, 243 Ga. 683, 684 (3) (256 SE2d 365) (1979).

I am authorized to state that Judge Barnes joins in Division 2 of this dissent.

DECIDED JULY 16, 1999.

*Cynthia W. Harrison*, for appellant.

*Paul L. Howard, Jr., District Attorney, Elizabeth A. Baker, Nathaniel Dobson, Jr., Assistant District Attorneys*, for appellee.