## A99A0980. THE STATE v. BECKER.
### (523 SE2d 98)

RUFFIN, Judge.

A Tift County grand jury indicted John Becker for driving under the influence of drugs and vehicular homicide. The trial court granted Becker's motion to suppress the results of chemical tests performed on his blood and urine, finding (1) that the tests were not given in a timely manner and (2) that the implied consent notices read to Becker were inadequate. The State appeals. We hold that there was insufficient evidence to support the trial court's first basis for suppressing the test results, and we reject the second basis. Accordingly, we reverse and remand.

In reviewing the trial court's ruling on a motion to suppress, we defer to the trial court's findings of fact unless they are clearly erroneous, and we construe the evidence most favorably to the trial court's decision.[1] Where the evidence is uncontroverted and there is no issue as to witness credibility, however, we review de novo the

---

[1] *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994).

trial court's application of the law to the undisputed facts.[2]

The undisputed evidence at the suppression hearing was as follows. On February 27, 1997, four Georgia correctional officers were killed after their van crossed the median on I-75 in Tift County and collided with oncoming traffic. According to one witness, a tractor-trailer truck forced the van off the road and continued on, leaving the scene of the incident. The witness reported the truck's tag number to the Georgia State Patrol (GSP), which sent officers in search of the truck. A trooper from GSP's Cordele patrol post apparently stopped the truck, driven by Becker, in or near Turner County. Because that trooper did not testify at the suppression hearing, we do not know where or when Becker was stopped or the circumstances of the stop.

Trooper Terry Rehberg, Assistant Post Commander of the Tifton patrol post, drove to Turner County to escort Becker back to Tift County. He met Becker's truck as Becker was driving south on I-75. Rehberg testified that he did not know how far Becker already had come at that point. Rehberg pulled in front of Becker's truck, and Becker followed Rehberg more than ten miles to the Tifton patrol post. According to Rehberg, Becker did not drive erratically and did not appear to be impaired.

After they arrived at the post, Rehberg and Becker engaged in "casual conversation," and Rehberg "invited [Becker] to have a seat." Rehberg did not smell any alcohol on Becker's breath, did not notice bloodshot eyes or slurred speech, and did not think Becker was unusually nervous. Becker asked to use the rest room. According to Rehberg, "[a]nticipating at that point that we might need a urine test and this being an opportunity, I read him the implied consent warning specifying urine, and provided him with a receptacle for the sample and showed him where the restroom was in the post." Rehberg read the implied consent warning for commercial drivers from a card supplied to him by the GSP. Becker then agreed to provide a urine sample. There was no testimony as to how much time passed between Becker's arrival at the patrol post and Rehberg's request for a urine sample.

Some time later, Rehberg drove Becker to the hospital, where the drivers of two other commercial vehicles involved in the collision were waiting. Rehberg read to all three drivers the implied consent warning for commercial drivers, specifying a blood test. At that point, the GSP did not have the results of Becker's urine test and requested the blood test only because the collision involved fatalities. Becker agreed to provide a blood sample.

Becker was charged with two counts of driving under the influ-

---

[2] *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994).

ence of drugs and eight counts of vehicular homicide. His motion to suppress the results of the blood and urine tests, which apparently were positive, raised numerous grounds. We address the two grounds decided by the trial court.[3]

1. The first issue before us is whether the blood and urine tests were given to Becker in a timely manner. Under OCGA § 40-5-55 (a), a driver of a motor vehicle in Georgia is deemed to consent to chemical testing of his blood, breath, urine, or other bodily substance to determine the presence of alcohol or other drugs if that person is (1) arrested for driving under the influence of an intoxicating substance in violation of OCGA § 40-6-391 (a); or (2) "involved in any traffic accident resulting in serious injuries or fatalities." Under the second scenario, the statute requires that the testing be administered "as soon as possible." We have construed this language to mean, "as soon as practicable under the circumstances."[4] The trial court found that there was an unexplained delay in the giving of the tests. The court noted that Rehberg had reasonable grounds for believing that Becker had caused an accident resulting in fatalities and therefore knew that chemical testing would be needed — yet he escorted Becker more than ten miles back to the Tifton patrol post before giving the tests.

Although our factual review is limited to a search for clear error, we cannot accept the trial court's conclusions based on the present record. There is no evidence of how much time passed between Becker's stop in Turner County and his escort back to Tift County, or between Becker's arrival at the Tift patrol post and the administration of the tests. Without such evidence, the trial court had no basis for finding an unexplained delay. On the other hand, we cannot accept the State's unsupported assertion that Becker's arrival at the Tifton patrol post presented "the first opportunity for the officers to obtain a urine sample," as there is no evidence as to what happened before Rehberg met Becker or whether the GSP could have obtained a urine sample at a closer patrol post. Thus, the trial court had an insufficient evidentiary basis for determining whether the tests were given "as soon as practicable under the circumstances."

Becker urges us to affirm the suppression order for a reason not decided by the trial court — because the State not only failed to administer the chemical tests as soon as possible, but also failed to read his implied consent notices in a timely manner. Before the giving of chemical tests, a driver must be read an appropriate implied consent notice stating the consequences of both submitting to and

---

[3] The trial court expressly reserved ruling on the other grounds Becker raised.
[4] *Seith v. State*, 225 Ga. App. 684, 687 (484 SE2d 690) (1997).

refusing the testing. OCGA § 40-5-67.1 (b). A driver arrested for DUI must be given the notice at the time of arrest, or as soon afterwards as feasible.[5] A driver who is given chemical tests solely due to involvement in a collision resulting in serious injuries or fatalities — and not because of an arrest for DUI — must be given the implied consent notice "within a reasonable amount of time after the accident, as determined by the circumstances."[6] If the driver is involved in an accident involving serious injuries or fatalities *and* is arrested, then the implied consent notice must be given at the time of arrest.[7] Becker argues that his initial stop by the GSP constituted an arrest and, thus, he should have been given the implied consent notice then. The trial court declined to decide this issue, as do we. There is insufficient evidence in the record concerning Becker's stop in Turner County to permit a determination as to whether he was under arrest then.

2. The implied consent notices that Rehberg read to Becker repeated almost verbatim the language of OCGA § 40-5-67.1 (b) (3), which sets forth the required notice for commercial drivers. These notices advised Becker that if he refused the testing, he would be disqualified from operating a commercial motor vehicle for a minimum of one year. The notices did not advise Becker that refusal to submit to the tests could also disqualify him from operating a private motor vehicle, as such language is not included in the statutory notice set forth in OCGA § 40-5-67.1 (b) (3). At the suppression hearing, Becker argued that Rehberg's failure to warn him about possible suspension of his private driving privileges violated a provision of the Uniform Commercial Driver's License Act, OCGA § 40-5-153 (c). That Code section states that a commercial driver who is asked to submit to chemical testing must be warned "that a refusal to submit to the test will result in that person's being disqualified from operating a commercial motor vehicle for one year under Code Section 40-5-151 and from operating a private motor vehicle as provided in Code Section 40-5-67.1."[8] OCGA § 40-5-153 (c). The trial court agreed with Becker, finding that the notices did not comply with § 40-5-153 (c) and that this lack of compliance was an additional basis for suppressing the results of the chemical tests. We reject this analysis.

At the outset, we note that the effect of the State's failure to comply fully with OCGA § 40-5-153 (c) appears to be an issue of first

---

[5] *Perano v. State*, 250 Ga. 704, 708 (300 SE2d 668) (1983).

[6] *Seith*, supra at 686-687.

[7] Id. at 686, n. 1; see also OCGA §§ 40-6-392 (a) (4); 40-5-55 (a).

[8] OCGA § 40-5-67.1 (d) states that if a driver of a commercial vehicle refuses a chemical test, the Department of Public Safety shall suspend *both* the commercial and private driving privileges of that driver.

impression in our Court. In *Roberson v. State*,[9] we held that the implied consent notice for commercial drivers listed in the current version of OCGA § 40-5-67.1 (b) (3) — the same notice that Rehberg gave in this case — is "an accurate statement of the consequences of refusing [chemical] testing." We further stated that the notice "gives sufficient information for drivers of commercial vehicles to make truly *informed* decisions about whether to submit to testing and the impact of that decision on their careers."[10] But we did not address whether the State must also warn that refusing a test will lead to suspension of personal driving privileges. Pretermitting that question,[11] we find that the omission of an additional warning about personal driving privileges did not require suppression of the test results in this case.

Although we once required precision in the giving of implied consent notices, it is now clear that the focus is on whether the notice given was substantively accurate so as to permit the driver to make an informed decision about whether to consent to testing.[12] In *Garrett v. Dept. of Public Safety*,[13] we recognized that the purpose of the implied consent law is to notify drivers of their rights so that they can make informed decisions. Accordingly, we have suppressed the results of chemical tests where the driver was misinformed of his rights and where that misinformation may have affected his decision to consent. In *State v. Coleman*,[14] for example, we held that suppression was required where an out-of-state driver was wrongly told that he would lose his driver's license if he refused testing. Likewise, we have suppressed evidence of the driver's refusal to consent where that refusal may have resulted from misleading information. In *State v. Terry*,[15] for instance, we affirmed the suppression of evidence of a driver's refusal to take a blood test where police falsely informed her that obtaining bond was a pre-condition to independent testing. We agreed with the trial court that the misinformation was confusing and could have affected the driver's decision to refuse testing.[16]

On the other hand, we have held that suppression was *not* required where a driver was misinformed about his implied consent

---

[9] 228 Ga. App. 416, 419 (1) (491 SE2d 864) (1997).

[10] Id.

[11] As it appears that law enforcement officials are relying on OCGA § 40-5-67.1 (b) (3) as a complete and accurate statement of the implied consent notice for commercial drivers, the legislature may want to amend that language if, indeed, additional warnings about personal driving privileges are also required.

[12] The current version of OCGA § 40-5-67.1 (b) states that the notices therein "need not be read exactly so long as the substance of the notice remains unchanged."

[13] 237 Ga. 413, 415 (2) (228 SE2d 812) (1976).

[14] 216 Ga. App. 598, 599 (455 SE2d 604) (1995).

[15] 236 Ga. App. 248 (511 SE2d 608) (1999).

[16] Id. at 251.

rights, but that misinformation did not affect his decision whether to consent to testing. In *Rojas v. State*,[17] a police officer correctly told a Florida driver that her privilege to drive on Georgia highways would be suspended for one year if she refused to take chemical tests. After she refused, he incorrectly told her that her refusal would result in immediate suspension of her license for one year. The trial court denied her motion to suppress and admitted evidence of her refusal. We held that the officer's misstatement of the law was harmless because it did not coerce the driver, who had already refused the testing, to consent. Thus, the trial court properly denied the motion to suppress.[18]

Here, as in *Rojas*, the omission of information from the notice given to Becker — if indeed it was error — was harmless. After hearing that refusal to consent to chemical testing could be used against him in court and would result in suspension of his commercial driver's license for one year, Becker agreed to take the tests. For him, those consequences alone were apparently severe enough to justify consenting. Being told that refusal to consent would result in an additional harsh consequence — suspension of personal driving privileges — could only have tipped the balance further in favor of consenting. The omission was therefore immaterial.

Moreover, there is no indication that Rehberg intentionally misled Becker. As we recognized in *Sorrow v. State*,

> [t]his is not a case where the state has subtly coerced [Becker] into choosing the option it had no right to compel, rather than offering a true choice. To the contrary, the State wants [Becker] to choose to take the test, for the inference of intoxication arising from a positive [chemical] test is far stronger than that arising from a refusal to take the test.[19]

Rehberg had every incentive to explain fully the consequences of refusing to consent and no reason to minimize them. Thus, suppression of the test results in this case cannot be justified as a punitive measure for overzealous law enforcement.

Under the circumstances, Rehberg's failure to tell Becker that his personal driving privileges would be suspended if he did not consent was not a valid basis for suppressing the test results.

---

[17] 235 Ga. App. 524, 527-528 (2) (509 SE2d 72) (1998).

[18] See also *Sorrow v. State*, 178 Ga. App. 83 (342 SE2d 20) (1986) (officer correctly told driver that refusal to consent to chemical testing could be used against him at trial and could result in suspension of his license and incorrectly told driver that his provisional license had already been suspended; false information was harmless because it did not coerce driver's refusal to consent).

[19] (Punctuation omitted.) Id. at 83-84.

3. Because the record is insufficient to support the trial court's first basis for suppression and the second basis is legally incorrect, we remand this case for a redetermination of the motion to suppress.[20] On remand, the trial court may, of course, consider the bases for suppression that it previously reserved ruling upon.

*Judgment reversed and case remanded. McMurray, P. J., and Andrews, P. J., concur.*

DECIDED OCTOBER 6, 1999 — 

*C. Paul Bowden, District Attorney*, for appellant.
*Benson, Phillips & Hoffman, Herbert W. Benson, Kunes & Kunes, G. G. Joseph Kunes, Jr.*, for appellee.

---

[20] See *Akins v. State*, 254 Ga. 641, 642 (331 SE2d 597) (1985); *State v. Waters*, 170 Ga. App. 505, 507 (2) (317 SE2d 614) (1984).
[1] OCGA § 12-3-230 et seq.