## A01A0156. YOUNT v. THE STATE.
(548 SE2d 674)

Mikell, Judge.

Arthur White Yount was convicted after a jury trial for driving under the influence of alcohol to the extent that it was less safe to drive and driving under the influence with an unlawful alcohol concentration.[1] Yount enumerates three errors on appeal: (1) the exclusion of his expert witness' testimony; (2) the denial of his motion for mistrial based on the fact that jurors were sleeping during the trial; and (3) the admission of the Intoxilyzer 5000 inspection certificates in the absence of the proper foundation. We affirm.

On appeal, "this court views the evidence in the light most favorable to support the verdict, and an appellant no longer enjoys a presumption of innocence."[2] Further, "[w]here the evidence is uncontroverted and there is no issue as to witness credibility, . . . we review de novo the trial court's application of the law to the undisputed facts."[3]

The uncontroverted evidence presented at trial shows that at approximately 1:11 a.m. on April 26, 1997, Yount stopped at a roadblock on East Paces Ferry Road in Atlanta. Officer Michael Pulliam, who was working the roadblock, testified that when he asked Yount for his driver's license and proof of insurance, "[Yount] was slow and listless like he was being impaired in some manner." Pulliam also smelled alcohol coming from Yount's window and noticed that Yount's eyes were glassy, his speech was slurred, and his skin was flushed. Consequently, Pulliam told Yount to pull over to the side of the road.

Pulliam asked Yount to participate in field sobriety tests, and Yount agreed to do so. Pulliam administered the horizontal gaze nystagmus, walk and turn, and leg-raise tests. On the horizontal gaze nystagmus test, Yount exhibited six out of six clues, which indicated the possibility of impairment. On the walk and turn test, Yount

---

[1] OCGA § 40-6-391 (a) (1), (5). The trial court merged and dismissed the unlawful concentration count and imposed sentence only on the "less safe" count.

[2] (Punctuation omitted.) *Dumas v. State*, 239 Ga. App. 210-211 (1) (521 SE2d 108) (1999).

[3] *State v. Becker*, 240 Ga. App. 267-268 (523 SE2d 98) (1999).

exhibited six out of a possible eight clues of impairment. Finally, Yount exhibited four out of four clues of impairment on the leg-raise test. Yount also had a positive alco-sensor reading.

As a result of Yount's performance on the sobriety tests and Pulliam's observations, Pulliam determined that Yount was a less safe driver and arrested him for driving under the influence of alcohol. Pulliam read the implied consent warning to Yount, who then agreed to take a breath test. Officer A. M. Corroto of the City of Atlanta Police Department administered Yount's breath test. Officer Corroto testified that the Intoxilyzer 5000 was in good working order and that he followed the correct procedures as he administered the breath test. Yount had an alcohol concentration of 0.164 grams on the first breath sample and 0.165 grams on the second breath sample.

1. In Yount's first enumeration of error, he argues that his convictions should be reversed because the trial judge excluded the testimony of his expert witness, Kenneth Habben. We disagree.

Yount's counsel offered Habben as an expert on infrared breath-testing machines, on the use of the machines to estimate breath alcohol, and in the fields of chemistry and toxicology. Habben testified that he had a bachelor's degree in chemistry and had retired as the chief toxicologist from the South Carolina State Law Enforcement Division approximately 18 months earlier. As the chief toxicologist, Habben was the head of the section that checked blood and urine samples for alcohol and drugs. Further, Habben was familiar with infrared breath-testing methods.

During his voir dire, Habben testified that South Carolina uses infrared breath-testing devices that are different from those used in Georgia, though he thought the machines were basically the same. Also, he was not certified to perform breath tests in Georgia or South Carolina, but did provide training to breath-testing specialists. Habben could not recall if he had ever tested a subject on the model of Intoxilyzer used in Georgia and testified that he had never repaired an Intoxilyzer 5000. When asked if he was familiar with the workings of the various breath-testing devices, he replied: "Overall, I know how the general device works, specific mechanisms, etc. But no, I have no knowledge, just the overall ability to give a result and what interference they may detect and may not detect." The trial judge refused to qualify Habben as an expert on the Intoxilyzer 5000, stating: "He's not certified. His testimony was that he doesn't know a thing about the internal workings of that particular machine and equipment and he's not qualified as an expert."

"It is a matter within the sound discretion of the trial judge as to whether a witness has such learning and experience in a particular art, science or profession as to entitle him to be deemed prima facie

an expert."[4] Thus, the trial court's decision as to a witness' qualifications to testify as an expert will be reversed only if that discretion is abused.[5] In light of Habben's testimony, we cannot conclude that the court erred in not qualifying Habben as an expert on infrared breath-testing machines.

Habben was also prepared to testify about how alcohol is absorbed and eliminated by the human body and the application of these principles to the testimony of Brian Young, who was with Yount on the evening before his arrest. The trial court excluded Habben's testimony on this issue on the grounds that it was irrelevant. This exclusion, however, was erroneous.

Young testified that between 7:30 p.m. and 12:30 a.m., Yount had six drinks.[6] Afterward, he and Yount went to a disco club. After dancing, Yount was very sweaty. Habben's proffered testimony was that the reading on the Intoxilyzer 5000 was elevated because of Yount's activities earlier that evening and that the Widmark Formula would possibly yield a different alcohol concentration.

Though the "admissibility of evidence is a matter which rests largely within the sound discretion of the trial court,"[7] we note that "Georgia courts favor the admission of any relevant evidence, no matter how slight its probative value."[8] The trial court should have allowed Habben's testimony as to the absorption and elimination of alcohol in the body. This error, however, does not warrant reversal in light of the overwhelming evidence of Yount's guilt in this case. "A party seeking reversal must show not only error but injury arising from the error alleged."[9] Pulliam's observations of Yount, coupled with Yount's performance on the field sobriety evaluations, were sufficient to authorize a finding of guilt beyond a reasonable doubt that Yount was a "less safe" driver.[10] Thus, at most, the exclusion of the evidence was harmless error, especially since the trial court ultimately dismissed the unlawful concentration count.

2. In his second enumeration of error, Yount argues that he did not receive a fair trial because the trial court did not take corrective measures after learning that jurors were sleeping at various points during the trial. We disagree.

---

[4] (Citation and punctuation omitted.) *Smith v. State*, 141 Ga. App. 720, 722 (6) (234 SE2d 385) (1977).

[5] *Kuptz v. State*, 179 Ga. App. 150, 151 (8) (345 SE2d 670) (1986).

[6] Young later testified that Yount had five to seven drinks.

[7] (Citation omitted.) *Kellogg v. State*, 233 Ga. App. 817, 819 (505 SE2d 794) (1998).

[8] *Evans v. State*, 233 Ga. App. 879, 881 (3) (506 SE2d 169) (1998).

[9] (Citation omitted.) *Shipman v. State*, 221 Ga. App. 160, 161 (2) (471 SE2d 225) (1996).

[10] See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

Should a juror fall asleep during the course of a trial it is the duty of the trial judge to awaken him. Should counsel or the parties in a trial observe a sleeping juror it is their duty to bring it to the attention of the court. What a litigant may not do is observe a juror sleeping, fail to bring this to the judge's attention at a time when corrective action may be had, take a chance on a favorable verdict, and then when the verdict is unfavorable have a mistrial or new trial because of the otiose juror.[11]

Yount moved for a mistrial at the close of the state's case, after the defense rested, and during the charge to the jury because some of the jurors were asleep. In each instance, however, he failed to bring the sleeping jurors to the trial court's attention when he observed them. Despite his failure to object contemporaneously, however, the court recharged the jury after Yount's third motion for a mistrial.

"The granting of a motion for a mistrial is within the discretion of the trial court, and the trial court's ruling will not be disturbed when the trial court has taken remedial measures sufficient to ensure a fair trial."[12] We find that the trial court did not abuse its discretion in this case. Further, though not required to do so due to the untimeliness of Yount's objections, the trial court's decision to recharge the jury was more than sufficient to ensure a fair trial.

3. Finally, Yount argues that his breath test results should have been excluded because the test cards were not attached to the original inspection certificates. OCGA § 40-6-392 (f) sets forth the requirements for the inspection certificate of an approved breath-testing instrument. The inspection certificates admitted as evidence in this case satisfy the requirements of the statute.[13] There is no requirement that the state attach the test cards to the inspection certificate. Accordingly, this enumeration is without merit.

*Judgment affirmed. Blackburn, C. J., and Pope, P. J., concur.*

DECIDED MAY 9, 2001.

*William C. Head,* for appellant.
*Joseph J. Drolet, Solicitor-General, Kenya M. Kuykendoll, Assistant Solicitor-General,* for appellee.

---

[11] (Citations omitted.) *Foster v. State*, 255 Ga. 425-426 (2) (339 SE2d 256) (1986).
[12] (Punctuation and footnote omitted.) *Carruthers v. State*, 272 Ga. 306, 314 (7) (528 SE2d 217) (2000).
[13] *Gidey v. State*, 228 Ga. App. 250, 251 (1) (491 SE2d 406) (1997).