## A03A2186. POPE v. THE STATE.

(598 SE2d 48)

BARNES, Judge.

Edward Kelvin Pope appeals his convictions of armed robbery, kidnapping, false imprisonment, burglary, and aggravated assault with a deadly weapon. Pope was convicted as a party to those crimes by unlawfully aiding, abetting, advising, encouraging, counseling, and procuring others to commit the crimes. Pope contended at his trial that he did not aid, abet, encourage, or procure the perpetrators of the crime, but the jury found him guilty and Pope was sentenced to a term of confinement of life plus 70 years. After his motion for a new trial was denied, Pope filed this appeal.

On appeal, he contends the evidence is insufficient to sustain his conviction, and that the trial court erred by denying his motion for a continuance, by excluding an out-of-court statement and a letter, and by permitting the State to bolster the testimony of some of its witnesses. Pope also contends the trial court erred by denying his motion for a mistrial after the State allegedly placed his character in issue, and by not replacing a sleeping juror.

1. The principles applicable to appellate review of a criminal conviction are stated in *Taylor v. State*, 226 Ga. App. 254, 255 (485 SE2d 830) (1997). The facts underlying Pope's conviction show that a

home invasion occurred on the evening of April 8, 1999. Shortly after 9:00 p.m., the Thurmonds were watching television when they heard a noise. They looked around and saw a man standing in a doorway pointing a shotgun at them. According to Sam Thurmond, the man "started screaming, get down, police, get down." Suddenly, another man appeared, tackled Mr. Thurmond, and, as the two struggled, the man with the shotgun struck Mr. Thurmond with the gun barrel. After subduing Mr. Thurmond, the two intruders bound both his and his wife's hands and feet with duct tape and taped a small pillow over Sam's face. The men then asked Mr. Thurmond where his safe was located and "where's that $300,000 hid at?" When Mr. Thurmond said he did not have the money, the men threatened to shoot Mrs. Thurmond. One man then put the shotgun barrel to Mr. Thurmond's neck and said, "we're going to blow your G--d-- head off if you don't tell us where that $300,000 is hid at." Mr. Thurmond testified that, while the two men were threatening him and his wife, he heard another intruder in the back of the house "turning things over." The men then took Mrs. Thurmond out of the room and forced her to reveal the combination to a gun safe

in the bedroom. The safe contained guns, jewelry, and approximately $35,000 in $100 bills. After clearing out the safe, the men "rummaged through" the rest of the house looking for things to steal. After spending approximately 15 to 20 minutes in the house, the intruders pulled the phones out of the walls and, as they were leaving, warned the Thurmonds: "don't move for 15 minutes, or we'll kill you. We've got a man up the road on a motorcycle. There's a man going to stay here with you for 15 minutes." After they left, Mrs. Thurmond wrestled the bindings from her hands and freed her husband. Mrs. Thurmond testified that she told her husband one of the men "touched me on the back and said, 'Georgialeen, we're not going to hurt you.' . . . I thought I recognized the voice of my nephew." [Mrs. Thurmond was apparently mistaken, as her nephew was never charged with the crime.] Using a cell phone, Mrs. Thurmond called 911. When the deputy sheriffs arrived, the Thurmonds described the intruders. According to Mr. Thurmond, he determined that there were at least four men in the house. The two men that the Thurmonds initially encountered did not have their faces concealed, and Mr. Thurmond testified that he got a clear look at the man carrying the shotgun. Mr. Thurmond saw a third man, who was wearing a ski mask, standing in the foyer. Mr. Thurmond further testified that he heard the voice of a fourth man coming from the bedroom. Mrs. Thurmond testified that she saw three men in the house that night. She stated that neither the man with the shotgun nor the other man they initially encountered had their faces concealed and that when she was taken down the hallway into the bedroom, she saw a third man standing in the foyer wearing a ski mask. As part of their investigation, law enforcement officers searched for a light-colored, American Motors Concord that, on the night of the incident, was spotted near the Thurmonds' home carrying four occupants. The day after the invasion, a deputy found the car, totally burned, in a wooded area. Investigators later determined that the car belonged to Randall Vaughn. Vaughn eventually pled guilty to several offenses arising out of his participation in the home invasion and testified for the State at trial. Vaughn identified Wilbanks, Michael Kozachyn, and Paul Kozachyn as the other intruders. Vaughn testified that he had known the Thurmonds since approximately 1961 and did not want to rob them because they were good friends. Thus, when the four men arrived at the Thurmonds' house that evening, Vaughn stayed in the car while Wilbanks and the Kozachyns went inside. Vaughn testified

that when he heard a commotion in the house, he put on a ski mask and went inside to "make sure the Thurmonds didn't get hurt." According to Vaughn, who is not Mrs. Thurmond's nephew, he was the individual who put his hand on her back and said, "Georgialeen, it'll be all right." At a bond hearing and at trial, Mr. Thurmond identified Paul Kozachyn as the assailant with the shotgun. Mr. Thurmond also identified Wilbanks at trial as the individual who tackled him. Mrs. Thurmond identified Paul Kozachyn as the man with the shotgun.

(Punctuation and footnote omitted.) *Wilbanks v. State*, 251 Ga. App. 248-250 (554 SE2d 248) (2001).

Pope was not identified as one of the men who actually participated in the home invasion. Subsequently, three men were convicted of the crimes resulting from this home invasion, and a fourth man pleaded guilty to charges arising from the incident, and testified against the others. *Wilbanks v. State*, supra, 251 Ga. App. at 249. None of the men convicted by the jury had ever been in the victims' home before the robbery.

Pope was the boyfriend of Elaine Thurmond, the former daughter-in-law of the Thurmonds. Naturally, Elaine Thurmond had been in the Thurmonds' home many times. She knew that a safe in the house usually contained a large amount of cash, and also knew about the house's alarm system.

After Pope was named in a petition to modify Elaine's child support, Pope became very angry. He stated that the Thurmonds would be made to pay through the billfold. Pope began asking Elaine about the Thurmond house, the location of safes, where money was located, and about the alarm system. Elaine gave him this information. Elaine told Pope that she did not want anything to happen while her children were staying with the Thurmonds. Pope knew that on the night of the robbery Elaine and her children would be away on spring break.

The day after the home invasion Elaine saw Pope in a car with Wilbanks. That evening she saw Pope and he showed her a stack of cash, and he told her "it might be Thurmond money." Elaine concluded from things that transpired that Pope knew the men involved in the home invasion.

Elaine later pleaded guilty to robbery and obstruction of justice. She was sentenced to 15 years to serve 30 months and the remainder on probation.

An FBI informant, Roger Lord, testified that he had discussed the robbery with Wilbanks after the home invasion. Lord also testified that after the home invasion, he met with Pope and Pope told him

that he had been shorted and only received $3,000 from the robbery, and that he got the layout of the house from Elaine.

This evidence is sufficient to sustain Pope's conviction within the meaning of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Pope contends the trial court abused its discretion by denying his motion for a continuance. Pope moved for the continuance because he wanted to secure the testimony of the men who were convicted of the crimes associated with the home invasion. These men did not testify at their trials and their counsel informed Pope that, if called as witnesses, they would assert their privilege against self-incrimination.

Under OCGA § 17-8-25,

> In all applications for continuances upon the ground of the absence of a witness, it shall be shown to the court that the witness is absent; that he has been subpoenaed; that he does not reside more than 100 miles from the place of trial by the nearest practical route; that his testimony is material; that the witness is not absent by the permission, directly or indirectly, of the applicant; that the applicant expects he will be able to procure the testimony of the witness at the next term of the court; that the application is not made for the purpose of delay but to enable the applicant to procure the testimony of the absent witness; and the application must state the facts expected to be proved by the absent witness.

Pope maintains that he met these standards, and that he was entitled to additional time in which to secure the testimony of these witnesses. We disagree. At the time of Pope's trial in August 2000, these potential witnesses had all been convicted, but their appeals were pending. Indeed, the appeals were not decided until a year later in August 2001. *Wilbanks v. State*, supra. Therefore, Pope could not satisfy the requirement of showing that the witnesses would be available at the next term of court. OCGA § 17-8-25. Accordingly, the trial court did not abuse its discretion by denying his motion for a continuance. *Letson v. State*, 236 Ga. App. 340, 341 (1) (512 SE2d 55) (1999).

3. Pope alleges the trial court abused its discretion by excluding from the evidence an out-of-court statement by Paul Kozachyn, one of the men convicted for the home invasion, and a letter from Wilbanks. Pope sought to introduce this evidence under the necessity exception to the hearsay rule. OCGA § 24-3-1 (b). The standards for admitting evidence under the necessity rule are set out in *Chapel v. State*, 270 Ga. 151, 155 (4) (510 SE2d 802) (1998):

> Under the necessity exception to the hearsay rule, hearsay statements are admissible when the evidence is "necessary" and when there are "particular guarantees of trustworthiness." . . . Additionally, the proponent of the evidence must show that the statement is relevant to a material fact and that the statement is more probative on that material fact than other evidence that may be procured and offered.

(Footnotes omitted.)

Pope contends that Paul Kozachyn and Wilbanks were unavailable because they both stated, through counsel, that they would assert their privilege against self incrimination if called to testify at Pope's trial. See *Glisson v. State*, 188 Ga. App. 152, 153 (2) (372 SE2d 462) (1988). Thus, the essential question is whether Kozachyn's statement and the letter would meet the reliability test of the necessity rule. Pope asserts that it did because Kozachyn made the statement during the investigation of the crime and his statement implicated him in criminal conduct.

As a general rule, admission of evidence is a matter resting within the sound discretion of the trial court, and appellate courts will not disturb the exercise of that discretion absent evidence of its abuse. *Whisnant v. State*, 178 Ga. App. 742, 743 (344 SE2d 536) (1986). Here, we find no abuse of discretion. Although what Pope says about Kozachyn's statement is true, what he does not say is that Kozachyn almost immediately disavowed his statement. As a consequence, the trial court found that Kozachyn's statement lacked any indicia of reliability. As this finding is amply supported by the record, we find no abuse of discretion.

Pope further contends the trial court erred by refusing to allow him to introduce a letter from Wilbanks to another witness in the case. In relevant part, the letter, signed "dum ass," but with Wilbanks' return address, stated, "My lawyer said they offered me 20 years to testify on K.P. and E.T. I told my lawyer I didn't even know the girl and I didn't know anything on K.P." The letter further says that the recipient knows that the author of the letter is not guilty. The trial court also found that the letter lacked any indicia of reliability and thus excluded the letter. Given the nature of the letter itself and the lack of any information tending to establish "particular guarantees of reliability," we find no abuse of the trial court's discretion.

4. Pope asserts that the trial court abused its discretion by denying his motion for a mistrial after the State allegedly injected his character in issue, and by denying his request to voir dire the witness about instructions given by the prosecutor. This enumeration of error asserts that the trial court abused its discretion because the answers

of witnesses placed Pope's character in question. First, we note that all these responses were made during Pope's cross-examination.

(a) In the first instance, the witness, Elaine Thurmond, was asked: "And you got quite upset because the Thurmonds were trying to say that you were basically an unfit mother, is that true?" She answered, "They were saying that because of my relationship with Kelvin and his criminal background —" Pope immediately objected, and the trial court sustained the objection and instructed the jury to disregard Elaine Thurmond's last statement.

Pope moved for a mistrial because of the statement and then asked for a curative instruction. The trial court stated:

> Ladies and gentlemen, I'm going to ask you to disregard the last response of the witness, Ms. Thurmond. And totally disregard that, take that completely out of your minds. Let me ask: Are there any jurors who cannot follow that instruction? Will you all agree not to consider the witness's last statement? If you would, please raise your hand if you will not consider that statement at all. If you'll not consider that statement, please raise your hand. Okay. All the jurors responded affirmatively. You may continue your cross-examination.

After Pope renewed his motion for a mistrial, the court again denied the motion. We find no abuse of discretion.

> When prejudicial matter is placed before the jury in a criminal case, the trial judge must decide whether a mistrial must be granted as the only corrective measure or whether the prejudicial effect can be corrected by withdrawing the testimony from the consideration of the jury under proper instruction. Here, the trial judge acted immediately, ruled out the offensive testimony, and properly instructed the jury not to consider the testimony in its deliberations. Under the facts of this case, we cannot say that this amounted to an abuse of discretion.

(Citations omitted.) *Stanley v. State*, 250 Ga. 3, 4 (2) (295 SE2d 315) (1982). The trial court acted promptly to sustain Pope's objection, instructed the jury to disregard the comment, and polled the jury to assure that the jury would follow the court's instructions.

(b) Pope next complains that the trial court abused its discretion by denying his motion for a mistrial after the State's confidential informant, Roger Lord, during his cross-examination, referred to a conversation with Wilbanks as "one thug talking to another," stated

that he had known a Danny Allen all of his life and that he was "[a]nother thug, just like me and him," stated that he and Wilbanks were "two crooks — two old crooks trust each other," and later said that "all crooks know all crooks."

Although Pope contends that when Lord said "another thug, just like me and him" Lord was referring to Pope, that is not clear from Lord's testimony. Further, upon Pope's motion for a mistrial, the trial court denied the motion and instructed the jury to disregard the testimony.

While Pope complains on appeal that Lord again injected his character in issue by stating that "all crooks know all crooks," this allegation is not properly before us because the transcript shows that Pope did not object or move for a mistrial contemporaneously with Lord's statement. *Gilliam v. State*, 240 Ga. App. 158, 159 (1) (522 SE2d 766) (1999). Pope did not raise this issue until later during a recess. In any event, the transcript shows that when Lord made this statement he was referring to Wilbanks and not Pope.

Trial counsel should not take chances asking questions which may elicit damaging answers and then demand a mistrial. *Felker v. State*, 252 Ga. 351, 377 (11) (314 SE2d 621) (1984). Further, whether to grant a mistrial is within the sound discretion of the trial court and his ruling will not be disturbed absent an abuse of discretion. *Ladson v. State*, 248 Ga. 470, 478 (12) (285 SE2d 508) (1981); *Nichol v. State*, 200 Ga. App. 297, 299 (2) (407 SE2d 493) (1991).

(c) Although Pope complains that he was not allowed to voir dire Lord about what instructions he was given by the prosecution regarding comments that might reflect on Pope's character, we find it highly probable that, even if this constituted error, the error did not contribute to the judgment, and accordingly that the error was harmless. *Johnson v. State*, 238 Ga. 59, 60 (230 SE2d 869) (1976); *Palmer v. State*, 186 Ga. App. 892, 897 (3) (369 SE2d 38) (1988). All of Lord's comments which Pope complains of occurred during his cross-examination, and in none of them did Lord refer to Pope. Further, we note that the trial court instructed Lord not to refer to Pope as a thief or a thug on cross-examination or the court would declare a mistrial and hold Lord in contempt.

Accordingly, we find that the trial court did not abuse its discretion in these matters.

5. Pope also contends the trial court erred by permitting the prosecution to bolster the testimony of Elaine Thurmond and Roger Lord. Regarding Elaine Thurmond, Pope argues that the trial court erred by allowing an agent to testify about the contents of the statement she gave to the authorities after she testified. He contends that this testimony was inadmissible under *Woodard v. State*, 269 Ga. 317, 319 (2) (496 SE2d 896) (1998), because her veracity had not been

challenged within the standards established in *Woodard* by alleging that her testimony was a recent fabrication or the result of improper influence or motive. Id. at 319. The transcript shows, however, that on cross-examination Pope questioned her about the benefits of her negotiated plea with the prosecution and whether her trial testimony was consistent with her statement to the authorities after her arrest. Therefore, we find that Pope sufficiently challenged Elaine Thurmond's veracity to allow her rehabilitation through her prior statement to the police. Accordingly, we find no error.

Pope next asserts that the trial court erred by allowing an agent to testify about prior occasions in which he had worked with Lord. Over Pope's objection, the agent testified that Lord had been an FBI informant for 13 years, that he had been responsible for solving at least six homicides, and that Lord placed himself at risk by doing so. Pope relies upon *Booker v. State*, 242 Ga. App. 80, 84 (3) (528 SE2d 849) (2000), to contend that we must find that this was error. Assuming without deciding that permitting the agent to show that Lord had been credible in the past was error, however, we find that in the context of the entire case, and particularly the testimony of Elaine Thurmond, any error was harmless as it is highly probable that the error did not contribute to the judgment. *Johnson v. State*, supra, 238 Ga. at 60; *Palmer v. State*, supra, 186 Ga. App. at 897.

6. Finally, we find Pope's allegation that the trial court erred by not replacing a juror who was sleeping during the presentation of evidence to be without merit. The transcript shows that Pope's counsel noticed the juror sleeping while a tape recording was playing and brought the matter to the attention of the court. The court noted that the tape had been played the day before and offered to have the tape replayed if Pope wanted. Pope rejected this option and asked that the juror be excused. After the court cautioned the juror and the juror explained that he had a cold and had just dozed off for a few seconds, the trial court denied Pope's request to excuse the juror. We find no error. Both Pope and the trial court properly followed their duties as set out in *Foster v. State*, 255 Ga. 425-426 (2) (339 SE2d 256) (1986). *Yount v. State*, 249 Ga. App. 563, 566 (2) (548 SE2d 674) (2001). Given the nature of the evidence presented, and the fact that the tape had been played earlier, it is apparent that Pope suffered no prejudice from the brief inattention of this juror. If any error resulted from not replaying the tape, Pope waived this error by rejecting the trial court's offer to do so.

*Judgment affirmed. Andrews, P. J., and Adams, J., concur.*

DECIDED MARCH 30, 2004 —

*Turner, Willis & Alderman, Brett D. Turner*, for appellant.

*Timothy G. Madison, District Attorney, Robin R. Riggs, Assistant District Attorney*, for appellee.