## S00A1623. MALAGUTI v. THE STATE.
### (543 SE2d 1)

SEARS, Justice.

The appellant, Thomas Malaguti, appeals from his conviction of the malice murder of Trevor Skinner.[1] On appeal, Malaguti contends that the trial court erred in denying his motion to exclude the testimony of a witness on the ground that the State failed to timely disclose that the witness would be an alibi rebuttal witness; that the trial court erred in admitting handwritten letters attributed to

---

[1] The crime occurred on January 9, 1998. Malaguti was indicted on April 23, 1998. This appeal stems from Malaguti's second trial on the indictment. The first trial occurred in November 1998 and ended in a mistrial when the jury was unable to reach a verdict. The second trial began on January 12, 1999, and Malaguti was found guilty of malice murder on January 15. That same day, the trial court sentenced Malaguti to life in prison. Malaguti filed a motion for new trial on February 12, 1999. The court reporter certified the transcript on February 19, 1999, and Malaguti filed an amended motion for new trial on June 23, 1999. The trial court denied Malaguti's motion for new trial on May 4, 2000. Malaguti filed a notice of appeal on May 23, 2000, and the case was orally argued on September 11, 2000.

Malaguti; and that a State's witness improperly placed Malaguti's character into evidence. We find no merit to these contentions, and affirm Malaguti's conviction for malice murder.

1. Tyshawn Kinebrew testified that about a month before Skinner was killed, Kinebrew saw Skinner hit Brent Whittle during an argument between Skinner and Whittle over money that Skinner allegedly owed to Whittle. Kinebrew added that he took Whittle to a hospital, where Whittle received stitches. At the time of this incident, Kinebrew lived with his girlfriend, Christine Anguin, in an apartment at the Abingdon Woods Apartments in Atlanta. According to Anguin and Kinebrew, shortly after Skinner struck Whittle, Anguin, Kinebrew, and Whittle drove to North Carolina, and picked up Malaguti. Kinebrew testified that while they were in North Carolina, Whittle told Malaguti about his altercation with Skinner, and that Malaguti stated that he would take care of it. Once Whittle, Malaguti, Anguin, and Kinebrew arrived back in Georgia, Malaguti lived with Anguin and Kinebrew at their apartment. Both Anguin and Kinebrew testified that, after they got back from North Carolina, Malaguti stated that he would become friends with Skinner and then kill him. Anguin testified that on January 9, 1998, she was at her apartment with Whittle and Malaguti. Anguin testified that Malaguti and Whittle were driving a gold Toyota Corolla; that they left the apartment sometime that night; and that they both were carrying guns. Anguin testified that Whittle and Malaguti came back to the apartment later that night, and that Malaguti stated that he had killed Skinner by shooting him once and then shooting him again in the head. Kinebrew testified that as it was getting close to dark on January 9, he saw Malaguti in the apartment carrying a black gun.

Charles Higgins and Derek Barrion testified that on the night of January 9, they were standing near the pool at the Cotswold Village Apartments in Atlanta, when Malaguti and Whittle drove up in a tan Toyota Corolla. Barrion testified that he knew Whittle and Malaguti, and that Malaguti had on numerous occasions spent the night at his apartment. Barrion added that he and Higgins talked to Whittle and Malaguti, and that Malaguti was driving the car. According to Barrion, he and Higgins got in the backseat of the car, and Malaguti drove to Building 16 in the Cotswold apartment complex. Barrion testified that Skinner's car was parked in front of Building 16 and that Skinner was standing near the building. Barrion stated that Malaguti motioned for Skinner to come over to the car; that the driver's side window was down; that Skinner walked in front of the car to go to the driver's window; that as he approached the mirror on the driver's side, Malaguti shot him; that Skinner fell down; and that Malaguti got out of the car, stood over Skinner, and shot Skinner several times. Barrion further testified that Malaguti got back in the

car, but that he (Barrion) got out of the car and ran.

Charles Higgins's testimony regarding the shooting was, for all relevant purposes, the same as Barrion's testimony. After the shooting, however, Higgins stayed in the car. He testified that Malaguti then drove the car to the Abingdon Woods Apartments, and that when Malaguti parked the car there, he (Higgins) ran home.

Ashley Carlin and Kelly Moon testified that they were at an apartment complex on the night of January 9 with two friends named Eric and Carlos. Ashley and Kelly both testified that as the car in which they were riding started to leave the apartment building, it was blocked in by a person driving a tan Toyota. Ashley and Kelly testified that their car was facing the tan Toyota; that they saw a person walk to the driver's side door of the Toyota; that the driver of the Toyota shot the person as he approached the driver's window of the Toyota; that the person who was shot fell to the ground; and that the driver then got out of the Toyota, leaned over the person on the ground, and shot him several times in the head from a distance of about a foot. Ashley and Kelly were unable to identify Malaguti as the driver of the Toyota.

Shantell Swint testified that she lives in Building 17-C in the Cotswold Village Apartments, and that on the evening of January 9, 1998, she heard a gunshot, looked out her patio door, and saw Malaguti standing over Skinner. She stated that she then saw Malaguti shoot Skinner several times in the head. Swint also testified that she had known Malaguti and Whittle since August 1997.

Rhonda Jones, who lived in Building 14-L in the Cotswold apartment complex, testified that she was the girlfriend of Charles Higgins. She stated that on the evening of January 9, 1998, she and Higgins were standing near the pool in the apartment complex, when Malaguti drove up in a gold Toyota. She added that Whittle was riding in the passenger seat. According to Jones, Higgins and Barrion got in the Toyota and Malaguti drove to Building 16 of the apartment complex. Jones stated that she could see Building 16 from where she was standing; that she saw Skinner walk to the driver's side of Malaguti's car; that as Skinner approached the driver's window, Malaguti shot him; that Skinner fell to the pavement; and that Malaguti then shot him again.

The medical examiner testified that Skinner died of four gunshot wounds to the head, any one of which could have been fatal, and that the victim's wounds were consistent with the victim having been shot once while standing and three times while lying down.

Malaguti was eventually arrested in New York, and after a jury trial, was convicted of the malice murder of Skinner. Having reviewed the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found Malaguti guilty

beyond a reasonable doubt of the murder of Skinner.[2]

2. Malaguti contends that the trial court erred in denying his motion to exclude the testimony of Anguin on the ground that the State failed to provide the required statutory notice that it intended to use Anguin as a witness to rebut Malaguti's alibi defense. We conclude, however, that the trial court did not err in denying the motion to prohibit Anguin from testifying.

Under OCGA § 17-16-5 (a), a defendant, upon demand by the State, must disclose to the State his intent to rely on an alibi defense at trial. The defendant's notice to the State "must be specific with regard to the place the defendant claims to have been at the time of the alleged offense and must provide the names, addresses, dates of birth, and telephone numbers of the witnesses upon whom the defendant intends to rely."[3] Conversely, "within five days of the defendant's written notice but no later than five days before trial,"[4] the State "shall serve upon the defendant . . . a written notice stating the names, addresses, dates of birth, and telephone numbers of the witnesses . . . upon whom the state intends to rely to rebut the defendant's evidence of alibi unless previously supplied."[5] If the State fails to comply with § 17-16-5 (b), a trial court is vested with discretion to

> permit the . . . interview of the witness, [to] grant a continuance, or upon a showing of prejudice and bad faith, [to] prohibit the state from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such order as it deems just under the circumstances.[6]

Significantly, even if the defendant makes a showing of bad faith and prejudice, the statute permits the trial court to grant relief other than the exclusion of the testimony of the witness in question.

In the present case, Malaguti properly notified the State on October 1, 1998, of his intention to rely upon an alibi defense at trial. The notice stated that during the time of the crime, Malaguti was with Anguin at Anguin's and Kinebrew's apartment.[7] The State did not locate Anguin until December 31, 1998. The trial was scheduled

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] *White v. State*, 271 Ga. 130, 131 (518 SE2d 113) (1999).

[4] OCGA § 17-16-5 (b).

[5] Id.

[6] OCGA § 17-16-6.

[7] The present trial was Malaguti's second trial for the murder of Skinner. At Malaguti's first trial, he provided an alibi defense, testifying that he was with Anguin when Skinner was shot. The State could not locate either Anguin or Kinebrew before the first trial. The jury was unable to reach a verdict in the first trial, and the trial court declared a mistrial.

to start on Monday morning, January 11, 1999. That morning, Malaguti filed a motion to exclude Anguin's testimony, and the trial court held a hearing on the motion. The record shows that, during the fall and winter of 1998 both the State and Malaguti tried to locate Anguin with no success. The State, however, was able to locate her on December 31, 1998. The prosecutor stated that he then instructed his secretary to put Anguin's name on the witness list and to serve defense counsel with it. He acknowledged that notice was not served on defense counsel until Thursday, January 7, and that it should have been done earlier but was not due to a mistake. Defense counsel stated that, although she was out of town from Thursday, January 7, to Sunday night, January 10, co-counsel was informed on Friday night, January 8, that Anguin had been located. In addition, at the hearing that morning, the prosecutor offered to assist defense counsel in running a criminal history of Anguin and provided defense counsel with his notes from his discussion with Anguin. The prosecutor also stated that he would make Anguin available to be interviewed that day by defense counsel's investigator. Moreover, the prosecutor offered to call Anguin toward the end of trial, and noted that defense counsel could ask for an additional continuance at that time should more time be required. The trial court concluded that the prosecutor had not acted in bad faith. The court also granted Malaguti a one-day continuance so that defense counsel could prepare for Anguin's testimony. The trial began Tuesday, January 12, and Anguin did not testify until late in the day on Wednesday, January 13.

We agree with Malaguti's contention that the State failed to comply with the notification requirements of § 17-16-5 (b) once it did locate Anguin.[8] We conclude, however, that the trial court did not abuse its discretion in permitting Anguin to testify. First, it is undisputed that Anguin was difficult to locate and that the State was not dilatory in failing to find her sooner. Second, the record supports the trial court's finding that the delay in notifying Malaguti that Anguin would testify was not in bad faith, but was the result of a mistake.[9] Third, the prosecutor offered to provide his notes of his conversation with Anguin to defense counsel, to make Anguin available to defense

---

[8] See *White*, 271 Ga. at 131 (State may not rely on its general witness list in complying with § 17-16-5 (b); instead, it must send out a separate list of alibi rebuttal witnesses).

[9] Contrary to Malaguti's assertion, the trial court did not conclude that the State's delay in disclosing that Anguin would be a rebuttal witness was prejudicial to Malaguti within the meaning of § 17-16-6. Instead, the trial court simply stated that Malaguti would be prejudiced by Anguin's testimony. The finding of prejudice that is required by § 17-16-6 in order for a trial court to prohibit a witness from testifying is not the prejudice that is inherent in the testimony of any opposing party's witness. Instead, the prejudice must arise from the failure to comply with the discovery statute.

counsel on Monday, January 11, and to run a check to determine if Anguin had a criminal history. Finally, in order to give defense counsel more time to prepare for Anguin's testimony, the trial court granted a one-day continuance and the prosecutor did not call Anguin as a witness until late Wednesday, January 13. Under the circumstances of this case, we conclude that the trial court did not abuse its discretion in determining that the appropriate remedy for the State's failure to comply with § 17-16-5 (b) was not to exclude Anguin's testimony, but was to grant a continuance and permit her to testify.

3. Malaguti also contends that the trial court erred in admitting into evidence letters that Malaguti had allegedly written to Anguin. We conclude, however, that even if the trial court erred in admitting the letters in question, the error was harmless given the overwhelming evidence of Malaguti's guilt, including the testimony of several eyewitnesses who saw Malaguti stand over the victim and shoot him several times.[10]

4. Malaguti contends that the trial court erred in denying the motion for mistrial that he made after Kinebrew testified on cross-examination that Malaguti had killed other people. The record, however, demonstrates that Kinebrew's testimony in this regard was responsive to the cross-examination of defense counsel. Accordingly, the trial court properly denied Malaguti's motion for a mistrial.[11]

5. In his final enumeration of error, Malaguti contends that if this Court were to agree with his first three enumerations of error, but rule that the errors were harmless, the Court should nevertheless reverse based upon the cumulative prejudice from the errors. In this regard, although Malaguti acknowledges that this Court has not adopted the cumulative error rule,[12] Malaguti urges this Court to adopt a rule that if one of several errors that occurred at trial stems from prosecutorial misconduct (Malaguti alleges that the prosecutor's failure to comply with § 17-16-5 (b) amounts to prosecutorial misconduct), then this Court will examine the cumulative effect of all errors to determine whether the defendant is entitled to a new trial. Regardless of the merits of such a rule, it would be of no use to Malaguti in the present case, as we have concluded that the trial court did not abuse its discretion in finding that the prosecutor did not act in bad faith,[13] and as we have held that two of Malaguti's con-

---

[10] See *Hester v. State*, 272 Ga. 197, 199 (528 SE2d 501) (2000).

[11] See *Simmons v. State*, 271 Ga. 563, 567 (522 SE2d 451) (1999).

[12] See *Laney v. State*, 271 Ga. 194, 198 (515 SE2d 610) (1999); *Jenkins v. State*, 268 Ga. 468, 471 (491 SE2d 54) (1997); *Forehand v. State*, 267 Ga. 254, 256 (477 SE2d 560) (1996).

[13] See Division 2, supra.

tentions are not meritorious.[14] Thus, there is no prosecutorial misconduct in this case. Accordingly, this enumeration of error is without merit.

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 5, 2001.

*Webb, Stuckey & Lindsey, Martin C. Jones, William M. McHugh, Jr., James B. McGinnis*, for appellant.

*J. Tom Morgan, District Attorney, Barbara B. Conroy, Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Daniel G. Ashburn, Assistant Attorney General*, for appellee.

---

[14] See Divisions 2 and 4, supra.