### A01A0918. WILBANKS v. THE STATE.
### A01A0919, A01A0920. KOZACHYN v. THE STATE (two cases).
(554 SE2d 248)

RUFFIN, Judge.

A jury found co-defendants Bobby Elwyn Wilbanks, Michael Kozachyn, and Paul John Kozachyn guilty of armed robbery, kidnapping, false imprisonment, burglary, and aggravated assault stemming from their invasion into the home of Sam and Georgia Thurmond. In these companion appeals, the three co-defendants enumerate numerous errors arising from various trial court rulings. For reasons which follow, we affirm.

Viewed in the light most favorable to the jury's verdict, the evidence shows that the home invasion occurred on the evening of April 8, 1999. Shortly after 9:00 p.m., the Thurmonds were watching television when they heard a noise. They looked around and saw a man standing in a doorway pointing a shotgun at them. According to Sam Thurmond, the man "started screaming, [g]et down[,] police[,] get down." Suddenly, another man appeared, tackled Mr. Thurmond, and, as the two struggled, the man with the shotgun struck Mr. Thurmond with the gun barrel.

After subduing Mr. Thurmond, the two intruders bound both his and his wife's hands and feet with duct tape and taped a small pillow over Sam's face. The men then asked Mr. Thurmond where his safe was located and "[w]here's that $300,000 hid at?" When Mr. Thurmond said he did not have the money, the men threatened to shoot Mrs. Thurmond. One man then put the shotgun barrel to Mr. Thurmond's neck and said, "[w]e're going to blow your G—d— head off if you don't tell us where that $300,000 is hid at." Mr. Thurmond testified that, while the two men were threatening him and his wife, he heard another intruder in the back of the house "turning things over." The men then took Mrs. Thurmond out of the room and forced her to reveal the combination to a gun safe in the bedroom. The safe contained guns, jewelry, and approximately $35,000 in $100 bills. After clearing out the safe, the men "rummaged through" the rest of the house looking for things to steal. After spending approximately 15 to 20 minutes in the house, the intruders pulled the phones out of the

walls and, as they were leaving, warned the Thurmonds: "[d]on't move for 15 minutes, or we'll kill you. We've got a man up the road on a motorcycle. There's a man going to stay here with you for 15 minutes."

After they left, Mrs. Thurmond wrestled the bindings from her hands and freed her husband. Mrs. Thurmond testified that she told her husband one of the men "touched me on the back and said, 'Georgialeen, we're not going to hurt you.' . . . I thought I recognized [the voice of] my nephew."[1]

Using a cell phone, Mrs. Thurmond called 911. When the deputy sheriffs arrived, the Thurmonds described the intruders. According to Mr. Thurmond, he determined that there were at least four men in the house. The two men that the Thurmonds initially encountered did not have their faces concealed, and Mr. Thurmond testified that he got a clear look at the man carrying the shotgun. Mr. Thurmond saw a third man, who was wearing a ski mask, standing in the foyer. Mr. Thurmond further testified that he heard the voice of a fourth man coming from the bedroom.

Mrs. Thurmond testified that she saw three men in the house that night. She stated that neither the man with the shotgun nor the other man they initially encountered had their faces concealed and that when she was taken down the hallway into the bedroom, she saw a third man standing in the foyer wearing a ski mask.

As part of their investigation, law enforcement officers searched for a light-colored, American Motors Concord that, on the night of the incident, was spotted near the Thurmonds' home carrying four occupants. The day after the invasion, a deputy found the car, totally burned, in a wooded area. Investigators later determined that the car belonged to Randall Vaughn.

Vaughn eventually pled guilty to several offenses arising out of his participation in the home invasion and testified for the State at trial. Vaughn identified Wilbanks, Michael Kozachyn, and Paul Kozachyn as the other intruders. Vaughn testified that he had known the Thurmonds since approximately 1961 and did not want to rob them because they were good friends. Thus, when the four men arrived at the Thurmonds' house that evening, Vaughn stayed in the car while Wilbanks and the Kozachyns went inside. Vaughn testified that when he heard a commotion in the house, he put on a ski mask and went inside to "make sure [the Thurmonds] didn't get hurt." According to Vaughn, who is not Mrs. Thurmond's nephew, he was the individual who put his hand on her back and said, "Georgialeen,

---

[1] Evidently, Mrs. Thurmond was mistaken, and her nephew was not charged with the crime.

it'll be all right." At a bond hearing and at trial, Mr. Thurmond identified Paul Kozachyn as the assailant with the shotgun. Mr. Thurmond also identified Wilbanks at trial as the individual who tackled him. Mrs. Thurmond identified Paul Kozachyn as the man with the shotgun.

### Case No. A01A0918 Wilbanks v. State

1. The record reflects that, prior to trial, Paul Kozachyn gave a statement to law enforcement officers in anticipation of a plea agreement. In the statement, Paul Kozachyn indicated that he and Michael Kozachyn were the two individuals who first encountered the Thurmonds and that he thought Michael had the shotgun. Wilbanks contends that this statement "directly contradicted that of Sam Thurmond with respect to the first two individuals who entered his residence." Wilbanks argues that, if he and Paul Kozachyn had been tried separately, he would have used Kozachyn's testimony "in [his] effort to demonstrate the lack of reliability in Thurmonds' [sic] identification." Accordingly, Wilbanks asserts that the trial court erred in denying his motion for severance.

To be entitled to severance, Wilbanks was required to demonstrate: "(1) a bona fide need for [Paul Kozachyn's] testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that [Paul Kozachyn] will in fact testify if the cases are severed."[2] We review a trial court's ruling on a motion for severance using the abuse of discretion standard.[3]

In this case, Wilbanks did not demonstrate that Paul Kozachyn would in fact testify if the cases were severed.[4] Furthermore, without Paul Kozachyn's testimony, his out-of-court statement to law enforcement officers would be inadmissible. "[I]t is an old and sound rule which excludes as incompetent any hearsay testimony relating statements attributed to an out-of-court declarant to the effect that the declarant, and not the accused, was the perpetrator of a crime."[5] Because Wilbanks wanted to use the statement to show that Paul Kozachyn, and not Wilbanks, was the intruder who attacked Mr. Thurmond, it would have been inadmissible hearsay in a separate trial. Accordingly, the trial court did not abuse its discretion in denying Wilbanks' motion.

2. Wilbanks also asserts the trial court erred in denying his

---

[2] (Punctuation omitted.) *Keener v. State*, 215 Ga. App. 117, 118 (1) (449 SE2d 669) (1994).

[3] See id.

[4] See id.

[5] *Grant v. State*, 212 Ga. App. 565, 566 (1) (a) (442 SE2d 898) (1994).

motion for change of venue. Again, we disagree.

A criminal defendant seeking a change of venue must establish: "(1) that the setting of the trial was inherently prejudicial or (2) that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible."[6] Inherent prejudice may be shown by proof of numerous, widely circulated, emotional media reports about the crime and by "widespread community fear and bias."[7] A trial court has discretion in ruling on the motion, and we will not disturb the trial court's ruling unless the court abuses that discretion.[8]

In this case, Wilbanks argues that "[i]n view of the extensive publicity, the sensational nature of the crime, and the prominence of the victims, [he] was denied a fair trial by having his case heard in Banks County." As evidence, Wilbanks cites six newspaper articles which recount the circumstances of the home invasion, the arrests of the defendants, and Vaughn's plea bargain. However, Wilbanks has not pointed to any inflammatory language in the articles that rendered venue in Banks County inherently prejudicial, and our review of the articles reveals no such content.[9] And, although Wilbanks asserts that numerous members of the venire acknowledged that they had read or heard something about the case, their mere familiarity does not equate to "widespread community fear or bias."[10]

Wilbanks also argues that the large percentage of the venire struck for cause established actual prejudice to a degree that rendered a fair trial impossible. According to Wilbanks, "[t]hirteen venire persons who had heard about the case or knew the Thurmonds were excused for cause." Although the record confirms that the trial court excused 13 of the 60 venire members for cause, it belies Wilbanks' assertion that all 13 were excused due to their familiarity with the case or with the Thurmonds. Rather, the record reveals that only seven of the panel members were excused due to preconceived notions about the case. Another member was excused because he knew the victims and was thus more inclined to believe their testimony. A ninth member of the venire, who knew the victims but stated that she was "completely impartial" and could decide the case based solely on the evidence and the law, was excused by the court in an "abundance of caution." The other four members were

---

[6] (Citations and punctuation omitted.) *Morrill v. State*, 216 Ga. App. 468, 470 (3) (454 SE2d 796) (1995).

[7] (Punctuation omitted.) Id.

[8] See id.

[9] See id. at 471 (3) (finding that record of media reports did not "show a 'barrage of inflammatory publicity immediately prior to trial amounting to a huge wave of public passion[, and that t]here [was] no evidence of total inundation of the judicial process by the media at . . . trial' ").

[10] (Punctuation omitted.) Id. at 470 (3).

excused for reasons totally unrelated to any prior knowledge about the case or the victims. Thus, only nine of sixty venire members, or fifteen percent, were excused for reasons related to their familiarity with the case or the victims.[11] As for the remaining members, the record reveals that they were questioned about their familiarity with the case, and Wilbanks "has not shown that any of them were unable to lay aside their impressions and render a verdict based on evidence presented in court."[12] For these reasons, we conclude that the trial court did not abuse its discretion in denying Wilbanks' motion for a change of venue.[13]

3. The record shows that when the sheriff was escorting the defendants into the courtroom after a lunch break, ten prospective jurors who were sitting in a hallway saw them in handcuffs. Another prospective juror saw the defendants in a police patrol car in the parking lot. The defendants argued that these incidents tainted the entire panel and moved for a mistrial. The trial court denied the motion, but permitted defense counsel to thoroughly question each of the prospective jurors about the matter. All but one of the panel members who acknowledged that they saw the defendants in handcuffs said that it would not influence their verdict, and the trial court excused the one exception. On appeal, Wilbanks asserts that the trial court erred in denying his motion for mistrial. We disagree.

As a general rule, jurors should not be permitted to see a defendant handcuffed in the courthouse.[14] However, where one or more of the jurors by chance sees a defendant in handcuffs, whether to grant a mistrial is within the trial court's discretion.[15] Here, Wilbanks has not shown how he was prejudiced by the viewing. Accordingly, we cannot say that the trial court abused its discretion in denying his motion for mistrial.[16]

4. Wilbanks asserts that the trial court erred in denying his challenge to the State's strike of the only African-American on the venire based on *Batson v. Kentucky*.[17] In reviewing this assertion, we are mindful that "[t]he trial court's decision on a *Batson* motion rests largely upon assessment of the prosecutor's state of mind and credibility; it therefore lies peculiarly within a trial judge's province. The trial court's factual findings must be given great deference and may

---

[11] Cf. id. at 471 (3) (19 of 115, or 16.5 percent, of potential jurors struck for cause relating to bias from pretrial publicity).

[12] Id.

[13] See id.

[14] See *Casey v. State,* 237 Ga. App. 461 (1) (515 SE2d 429) (1999).

[15] See id. at 462; *Howard v. State,* 144 Ga. App. 208, 213 (8) (240 SE2d 908) (1977).

[16] See id.

[17] 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

be disregarded only if clearly erroneous."[18]

The transcript reveals that, during voir dire, one of the defendant's attorneys asked if anyone knew Kirby Gary, the operator of a local used car lot. Five panel members responded affirmatively. Of those five, one was excused for an unrelated reason and two others, who were at the end of the panel list, were not reached when the jury was struck. Of the two remaining potential jurors who responded that they knew Gary, one was an African-American who stated: "I've just heard of him just in passing. I work over near there." The other potential juror, who was white, stated: "I sold him a car . . . [a]nd I knew his mother." During jury selection, the State struck both of these venire members. When the defendants objected to the State's strike of the only African-American, the district attorney explained: "I've struck the only two people in the panel that had business dealings with Kirby Gary. Kirby Gary is a dope-dealing criminal who also happens to be a State's witness. I want no one on the panel that knows him whatsoever, and I struck the only two people that indicated that they knew him."

Wilbanks argues that "[t]he fact that [the African-American juror] 'had heard of' Gary 'in passing' was not a valid reason to strike [him]" and that the trial court therefore erred in denying his motion.[19] "Under existing precedent, a race-neutral explanation need not be persuasive, plausible or make sense, but is an explanation 'based on something other than the race of the juror. Unless a discriminatory intent is inherent in the proponent's explanation, the reason offered will be deemed race(-)neutral.' "[20] Though the juror's passing familiarity with Gary may be of questionable relevance, it is clearly a race-neutral explanation.[21]

The remaining question, "whether [Wilbanks] carried his burden of showing the proffered reason[ ] [was] merely designed to 'cover up' purposeful racial discrimination," was properly left for the trial court to resolve.[22] Although Wilbanks argues on appeal that the State could have taken further steps to ensure that the other three potential jurors who knew Gary — the two at the end of the panel list and the one dismissed for cause — would not be impaneled, and that this constitutes evidence of discriminatory intent, these matters were

---

[18] (Punctuation omitted.) *Byron v. State*, 229 Ga. App. 795, 797 (5) (495 SE2d 123) (1997).

[19] Because the State proffered a purportedly race-neutral explanation for the strike, we need not address whether Wilbanks established a prima facie case of discrimination. See id. at 798 (5).

[20] Id.

[21] See id. (concluding that a juror's relationship with an individual who is in trouble with the law is a race-neutral reason for striking the juror).

[22] (Punctuation omitted.) Id.

properly left for the trial court to resolve.[23] Moreover, because Wilbanks did not raise these arguments below, he has waived them for appeal.[24] Accordingly, on the record before us, we conclude that the trial court's determination that the State did not engage in purposeful racial discrimination is not clearly erroneous.[25]

5. Wilbanks asserts two errors related to the trial court's rulings allowing a witness to testify after the State removed him from its witness list. The transcript reveals that the witness, Jessie Roger Lord, was a lifelong acquaintance of Wilbanks and a career criminal. The day after the home invasion, Wilbanks contacted Lord and told him about the incident. Lord, who had been a Federal Bureau of Investigation (FBI) informant, contacted the FBI, and an agent equipped him with a recording device which, on April 13, 1999, he used to tape a conversation with Wilbanks.

At a motions hearing three and one-half weeks before trial, the State identified Lord as a witness and provided the defendants with copies of Lord's criminal history. The court ordered "the State to make a good faith effort" to provide the defendants with certified copies of Lord's criminal convictions prior to trial.

On the first day of jury selection, the State announced that it would not be calling Lord as a witness. After the announcement, Wilbanks' attorney made "a motion in limine in case [the district attorney] tries to get those [tape-recorded conversations] in." The district attorney responded, "I will not attempt to introduce the tapes unless I call Mr. Lord as a witness." The court granted the motion. Wilbanks' attorney then stated, "[s]o Mr. Lord will not testify in this trial," and the trial judge responded, "[t]hat only the State can say for sure. I'll not permit his statement to be introduced unless he testifies at trial." A dispute then arose concerning the State's failure to provide the defendants with certified copies of Lord's criminal convictions, and the defendants continued to insist that the State definitively confirm whether Lord would testify, claiming that it affected trial strategy, such as whether they would move for a continuance based on the State's failure to provide the certified copies. In resolving the controversy, the trial judge stated: "I don't believe that we need to go into the efforts of the State to secure those prior convictions unless and in fact Mr. Lord testifies. . . . If Mr. Lord is called to testify, we'll revisit all these issues."

Contrary to its earlier announcement, the State called Lord as a witness and introduced a recorded conversation between Lord and Wilbanks. According to the district attorney, he previously did not

---

[23] See id.
[24] See *Zant v. Moon*, 264 Ga. 93, 94 (1) (440 SE2d 657) (1994).
[25] See *Byron*, supra.

believe Lord's testimony would be necessary because the State had reached a plea agreement with Vaughn, in which Vaughn agreed to testify for the State. However, according to the district attorney, Vaughn did not testify as expected.[26] In ruling that Lord could testify, the trial court found that the State had identified him as a witness well before trial and that the district attorney was acting in good faith when he originally announced that Lord would not be called as a witness. The court, however, granted Wilbanks' motion to continue the trial until the next day to provide the defendants time to prepare for Lord's testimony.

(a) Wilbanks asserts that the trial court erred in permitting Lord to testify. We disagree. Georgia law requires the State to identify its witnesses to criminal defendants at least ten days before trial, but provides an exception where the trial judge finds "good cause."[27] When a trial court invokes the exception, our Code merely requires that defense "counsel shall be afforded an opportunity to interview such witnesses prior to the witnesses being called to testify."[28] "The witness list rule is designed to prevent a defendant from being surprised at trial by a witness that the defendant has not had an opportunity to interview,"[29] and a trial court's decision to allow a witness to testify will not be reversed on appeal absent an abuse of discretion.[30]

In this case, we note initially that although the district attorney was steadfast in his representations before trial that he did not anticipate needing Lord's testimony, the trial judge did not foreclose the possibility that Lord would be permitted to testify. Considering these circumstances, along with the trial court's finding that the State was acting in good faith, the fact that the defendants were fully aware of the substance of Lord's potential testimony, and the trial court's grant of a continuance, we conclude that the trial court did not abuse its discretion in admitting the testimony.[31]

(b) Wilbanks also asserts that the trial court erred in allowing the State to play to the jury the recorded conversation between Lord and Wilbanks. Wilbanks argues that the court's admission of the tapes violated its earlier motion in limine to exclude the tapes from evidence.

---

[26] Although it is unclear exactly why the district attorney considered Vaughn's testimony deficient, the transcript reveals that he had a serious drinking problem and that during the week of the home invasion he "would drink, then . . . go to sleep[,] . . . wake up and . . . drink some more." Vaughn conceded that he was in a drunken stupor on the evening of the home invasion and that the only reason he was testifying is because he "didn't want to go to prison the rest of [his] life."

[27] OCGA § 17-16-8 (a).

[28] Id.

[29] *Mize v. State*, 269 Ga. 646, 653 (7) (501 SE2d 219) (1998).

[30] *Malaguti v. State*, 273 Ga. 398, 402 (2) (543 SE2d 1) (2001).

[31] See id. at 402-403.

Wilbanks has misconstrued the trial court's ruling on his motion in limine. Motions in limine

> may be used two ways: 1) The movant seeks, not.a final ruling on the admissibility of evidence, but only to prevent the mention by anyone, during the trial, of a certain item of evidence or area of inquiry until its admissibility can be determined during the course of the trial outside the presence of the jury; and 2) The movant seeks a ruling on the admissibility of evidence prior to the trial.[32]

In this case, the transcript clearly reflects that Wilbanks did not seek an order on the admissibility of the tapes, but only a provisional order "in case [the district attorney] tries to get those [tape-recorded conversations] in." Indeed, the court granted the motion only after the district attorney responded, "I will not attempt to introduce the tapes unless I call Mr. Lord as a witness." Furthermore, before the court allowed the State to play the tapes, it entertained the defendants' objections to their admissibility outside the presence of the jury. Under these circumstances, we find no error.[33]

(c) Wilbanks argues that the trial court's admission of the taped conversations violated his Fifth and Sixth Amendment rights. Specifically, Wilbanks argues that Lord was a State agent at the time he recorded the conversation and that in both *Overby v. State*[34] and *State v. Rogers*,[35] we ruled that a defendant in custody who is suspected of a crime must be informed of his rights against self-incrimination prior to being interrogated by such State agents. Wilbanks concedes, however, that at the time Lord taped the conversation, "the Appellant was not in custody." Accordingly, this argument is without merit.[36]

As for Wilbanks' Sixth Amendment argument, it is clear that a person's right to counsel attaches only "at or after the time that judicial proceedings have been initiated against him — whether by way of formal charge, preliminary hearing, indictment, information or arraignment."[37] It is undisputed that when Lord taped the conversations, judicial proceedings had not yet commenced against Wilbanks. Thus, this argument fails as well.

6. Wilbanks asserts that the trial court erred in denying his

---

[32] (Punctuation and emphasis omitted.) *Gaston v. State*, 227 Ga. App. 666, 669 (2) (490 SE2d 198) (1997).

[33] See id.

[34] 160 Ga. App. 537, 538 (1) (287 SE2d 568) (1981) (physical precedent only).

[35] 173 Ga. App. 653, 654 (327 SE2d 782) (1985) (physical precedent only).

[36] See *Guess v. State*, 264 Ga. 335, 336 (2) (443 SE2d 477) (1994).

[37] (Punctuation omitted.) *State v. Simmons*, 260 Ga. 92, 93 (390 SE2d 43) (1990).

motion in limine to exclude hearsay testimony establishing a similar transaction. The similar transaction evidence showed that, in 1985, Wilbanks and an accomplice invaded a home in South Carolina. Wilbanks pled guilty to armed robbery and burglary charges arising from the invasion. In this case, the State sought to establish the similar transaction with copies of the indictment, guilty plea, and sentence, and through testimony from one of the investigating officers, Gene Stone. During the State's proffer of Stone's testimony, Stone revealed that the victim was deceased, talked about the victim's account of the invasion, and related statements made to Stone by Wilbanks' co-defendant. The court admitted evidence of the indictment, plea, and sentence. As for Stone's testimony, the trial judge stated: "I think it's clear that Mr. Stone received all[, or most,] of this information from [the victim]. . . . I think that . . . his being deceased is a necessity exception to the hearsay rule."

On appeal, Wilbanks does not challenge the trial court's ruling that the victim's statements fell within the necessity exception to the hearsay rule, but argues that "the statements of the co-defendant were clearly hearsay and, as a matter of law, would lack the indicia of reliability required for the necessity exception to apply." We need not decide whether the trial court erred in admitting Stone's testimony about the co-defendant's statements[38] because the purported hearsay was merely cumulative of evidence establishing the similar transaction, including the indictment and plea, and Stone's other testimony. Under these circumstances, "it is highly probable that the court's error[, if any,] did not contribute to the verdict, and was thus, harmless."[39]

7. At the sentencing hearing, the State introduced evidence, for recidivist punishment, of Wilbanks' guilty plea to offenses arising out of the 1985 South Carolina home invasion. That evidence showed that Wilbanks, who was represented by counsel, signed a statement on the back of each indictment acknowledging that he pled "guilty to the charge in the indictment." In addition, the State pointed to Stone's testimony at the similar transaction hearing in which he stated that he was present when Wilbanks pled guilty. Although Stone did not recall everything that was said at the plea hearing, he heard the judge go over Wilbanks' rights and specifically remembered the judge reviewing with Wilbanks his right to a jury

---

[38] See *Parker v. State*, 244 Ga. App. 419, 421 (3) (535 SE2d 795) (2000) ("[h]earsay testimony to establish the similarity of other transactions is allowed when given by a law enforcement official who actually investigated and has personal knowledge of the other transactions"); but see *Grano v. State*, 265 Ga. 346, 347 (3) (455 SE2d 582) (1995) (holding that "[e]vidence of prior violent acts . . . may not be established by hearsay testimony").

[39] *Jones v. State*, 272 Ga. 154, 157 (4) (527 SE2d 543) (2000).

trial and his right to not plead guilty. Stone further testified that he recalled the judge asking Wilbanks whether he was pleading guilty because "someone promised him something," and Wilbanks responding that "he was pleading guilty because he was guilty of the crime."

In response to the State's evidence, Wilbanks testified that he did not knowingly and voluntarily enter the plea in the prior case because the trial judge did not inform him of his rights and that the only reason he pled guilty was because his appointed counsel "threatened [him] with the worst" if he did not enter the plea. Notwithstanding Wilbanks' testimony, the trial court in this case found that Wilbanks' prior plea was voluntary and considered it in sentencing him. On appeal, Wilbanks asserts that the trial court erred in sentencing him as a recidivist based on the prior plea. We disagree.

In determining whether recidivist punishment is appropriate in a nondeath penalty case, the initial

> burden is on the State to prove both the existence of the prior guilty pleas and that the defendant was represented by counsel. . . . Upon such a showing, the presumption of regularity is then applied and the burden shifts to the defendant to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. Defendant can attempt to meet his burden of production with a transcript, with testimony regarding the taking of the plea, or with other affirmative evidence. A silent record or the mere naked assertion by an accused that his prior counseled plea was not made knowingly and intelligently is insufficient. If the defendant is able to present evidence that a constitutional infirmity exists, then the burden of proving the constitutionality of the plea shifts to the State.[40]

In a case like this, where the burden shifts back to the State, and the State attempts to meet its burden with less than a " 'perfect' transcript of the taking of the guilty plea, . . . the judge then must weigh the evidence submitted by the defendant and by the State to determine whether the State has met its burden of proving that defendant's prior guilty plea was informed and voluntary, and made with an articulated waiver of the three *Boykin* rights."[41]

---

[40] (Citations and punctuation omitted.) *Nash v. State*, 271 Ga. 281, 285 (519 SE2d 893) (1999).

[41] Id. See also *Parke v. Raley*, 506 U. S. 20, 37 (113 SC 517, 121 LE2d 391) (1992) (ruling that it is appropriate for trial court to consider a "defendant's prior experience with the criminal justice system[,] . . . [his] admission that he understood the charges against him and

In this case, the State met its initial burden with proof of the guilty pleas and proof that Wilbanks was represented by counsel. Thus, a presumption of regularity applied to the plea hearing.[42] Wilbanks' only evidence of procedural irregularities was his own self-serving testimony that the South Carolina trial court did not advise him of any of his rights and that the only reason he pled guilty was because his attorney "threatened" him. Wilbanks' testimony, however, was contradicted, in part, by Stone's testimony that he heard the judge going over Wilbanks' rights, that he specifically recalled the trial judge reviewing Wilbanks' right to a jury trial and to not plead guilty, and that Wilbanks acknowledged that he pled guilty because he was guilty. The sentencing judge in this case, who was charged with weighing this evidence and assessing the credibility of the witnesses, was authorized to dismiss Wilbanks' self-serving, impeached testimony that the South Carolina court totally disregarded his rights, in favor of the State's conflicting evidence and the presumption of regularity.[43] Under these circumstances, the trial court did not err in finding that Wilbanks' plea was knowing and voluntary and in considering the plea for recidivist sentencing.

### Case No. A01A0919 Kozachyn v. State

8. Michael Kozachyn asserts that the evidence was insufficient to support his conviction because the only evidence of his guilt was the testimony of an accomplice, Vaughn, which was not sufficiently corroborated. We disagree.

Initially, we note that in reviewing Kozachyn's assertion, we review the evidence presented at trial in the light most favorable to support the jury's verdict and determine whether this evidence is sufficient to authorize a rational trier of fact to find Kozachyn guilty of the crimes charged beyond a reasonable doubt.[44] Although Kozachyn is correct that he could not be convicted based solely on Vaughn's uncorroborated testimony,

> the sufficiency of the corroboration evidence is peculiarly a matter for the jury to determine. If the verdict is founded on slight evidence of corroboration connecting a defendant with the crime, the verdict is legally sufficient. The necessary cor-

his self-serving testimony that he simply could not remember whether the trial judge advised him of other rights").

[42] See *Nash,* supra.

[43] See id.; *In the Interest of T. B. R.,* 224 Ga. App. 470, 475-476 (1) (c) (480 SE2d 901) (1997) (holding that trial court, sitting as factfinder, was required to assess witness credibility and was authorized to disregard witnesses' self-serving testimony).

[44] See *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

roboration may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime.[45]

An accomplice's testimony may be corroborated by the testimony of a second accomplice.[46]

In this case, Vaughn testified that Michael Kozachyn and Paul Kozachyn were brothers and that both participated in the home invasion. Mr. and Mrs. Thurmond partially corroborated this testimony by identifying Paul Kozachyn as one of the intruders. More significantly, however, during Wilbanks' recorded conversation with Lord about the home invasion, Lord asked Wilbanks, "how many did it take[,]" and Wilbanks responded, "the two brothers. They're good for what they do, now. I mean, I'm telling you the truth."

In addition to this evidence, Vaughn testified that immediately after the robbery, they all went to Wilbanks' house where they split up the money, and he then accompanied the Kozachyn brothers back to the house where the three men lived with Michael and Paul's mother. This testimony was corroborated by the mother's testimony that, the following day, Friday, April 9, she saw Michael stash what she assumed was his paycheck money in a cookie box. The mother apparently assumed that this was Michael's paycheck money because he was paid on Fridays and by the end of the weekend he was always broke. However, Michael's employer testified that Michael quit his job the day before the home invasion and that he did not pick up his paycheck that Friday. While this evidence is circumstantial, it sufficiently corroborates Vaughn's testimony that Michael Kozachyn participated in the home invasion.[47]

9. Michael Kozachyn asserts that the trial court erred in denying his motion for severance. In ruling on a motion for severance, a trial court must consider: "(1) [w]hether a joint trial will create confusion of evidence and law; (2) whether there is danger that evidence implicating one defendant will be considered against the other, despite cautionary instructions to the contrary; and (3) whether the co-defendants will press antagonistic defenses."[48] To support his assertion that the trial court erred in denying his motion, Kozachyn must "do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing of

---

[45] (Citations and punctuation omitted.) *Bradford v. State*, 262 Ga. 512, 513 (421 SE2d 523) (1992).

[46] See *Barnett v. State*, 244 Ga. App. 585, 587-588 (2) (536 SE2d 263) (2000).

[47] See *Bradford*, supra.

[48] *Dennard v. State*, 263 Ga. 453, 455 (5) (435 SE2d 26) (1993).

prejudice and a consequent denial of due process."[49]

(a) To meet this burden, Michael Kozachyn first argues that he should have been tried separately because there was only slight evidence of his guilt, and his conviction therefore likely resulted from a spillover of the substantial evidence of his co-defendants' guilt.[50] Specifically, Kozachyn points to Mrs. Thurmond's testimony that she thought she recognized the voice of the person who told her not to worry as that of her nephew, who was not charged with the crime. According to Kozachyn, this evidence shows that the nephew was, in fact, the fourth intruder, thus establishing his innocence.[51] In addition, Kozachyn contends that the jury would likely have acquitted him, but for Mr. Thurmond's identification of Paul Kozachyn and Wilbanks, the taped conversation between Lord and Wilbanks, Lord's testimony about Wilbanks' admission of guilt, and evidence of Wilbanks' similar transaction.

While we do not dispute that " 'the state submitted more evidence against [Wilbanks and Paul Kozachyn] than against [Michael Kozachyn], we do not believe it highly probable that [Michael Kozachyn] was convicted as the result of a spillover of the greater volume of evidence adduced solely against [his co-defendants].' "[52] As for Kozachyn's assertion that the nephew's presence precluded a finding that he, Kozachyn, was one of the four intruders, Vaughn testified that he was the one who patted Mrs. Thurmond on the back and told her not to worry. Thus, the evidence shows that Mrs. Thurmond was mistaken about the presence of her nephew in the house that evening. Furthermore, while the evidence corroborating Vaughn's testimony was arguably slight, the recorded conversation and the mother's testimony circumstantially informed the jury that the Kozachyn brothers participated in the home invasion and that Michael Kozachyn was seen hiding his share of the theft proceeds in a cookie box the day after the incident.

Moreover, the circumstantial nature of this corroborating evidence does not necessarily diminish the probative value of Vaughn's unequivocal identification of Michael Kozachyn as a participant in the home invasion. And, while Mr. Thurmond was unable to identify Michael Kozachyn as a participant in the invasion, this is not necessarily a testament of Kozachyn's innocence. Rather, it is likely attributable to the fact that Thurmond heard, but did not see, Kozachyn

[49] Id.

[50] See *Price v. State*, 155 Ga. App. 844, 846 (1) (273 SE2d 225) (1980).

[51] Kozachyn argues that the evidence showed the four intruders were the nephew, Paul Kozachyn and Wilbanks, who were both positively identified by Mr. Thurmond, and Vaughn, who confessed.

[52] *Henderson v. State*, 162 Ga. App. 320, 326 (6) (292 SE2d 77) (1982).

during the invasion.[53] Finally, the transcript shows that, prior to the State introducing the similar transaction evidence against Wilbanks, the trial court instructed the jury that the evidence "is not to be considered by you for any purpose regarding Michael Kozachyn or Paul Kozachyn. The evidence you're about to hear has nothing at all to do with either of those two defendants." Although Wilbanks' prior act was similar to the instant home invasion, the similar crime evidence in no way implicated Michael Kozachyn as a participant in that crime, and he has not shown why the jury would consider the evidence against him, despite cautionary instructions to the contrary.[54] Accordingly, we conclude that the trial court did not abuse its discretion in denying Kozachyn's motion to sever based on a possible spillover of evidence against his co-defendants.

(b) Kozachyn also contends that the trial court should have granted a severance because he and his co-defendants presented antagonistic defenses and trial strategies. The only purportedly antagonistic tactic raised by Kozachyn relates to the Thurmonds' identification of Wilbanks and Paul Kozachyn as two of the intruders. Michael Kozachyn contends that, during cross-examination, his co-defendants vigorously attacked the Thurmonds' identification testimony, while he never disputed that the two co-defendants were guilty. Thus, Kozachyn asserts, his strategy was to not challenge the Thurmonds' identification testimony during cross-examination.

The record belies Kozachyn's assertion. During his cross-examination of Mr. Thurmond, Kozachyn's trial counsel challenged his recollection of the physical characteristics of Paul Kozachyn, the shotgun wielding intruder, and pointed out that Mr. Thurmond was unable to identify Paul Kozachyn in a photo lineup. Although it appears that Michael Kozachyn attempted to establish that he was not one of the two unmasked initial intruders in the home, and that Mrs. Thurmond's nephew was in the home, he has not shown how such strategy conflicted with the tactics of his co-defendants, or how he was prejudiced by the court's refusal to sever the trial on this ground.[55] Accordingly, this enumerated error is without merit.

10. Michael Kozachyn asserts that the trial court erred in overruling his objection to an improper comment by the prosecutor. The comment was made during the district attorney's direct examination of the Kozachyns' mother, Anna Walker, who testified that she was

---

[53] Cf. *Price*, supra (in light of the fact that eyewitnesses *saw* both perpetrators of the crime, but were able to select only one out of a photo lineup, and the minimal evidence against the unidentified perpetrator, it was highly probable that the unidentified perpetrator's conviction was the result of some spillover of the evidence).

[54] See *Dennard*, supra.

[55] See id.

having financial difficulty. Nonetheless, Walker acknowledged that eight days after the home invasion she purchased a car with $4,500 in $100 bills. While on the witness stand, Walker asked the district attorney: "Would you like to know where it came from?" The district attorney responded: "I know where it came from. Thank you." The court overruled a defense objection to the prosecutor's response, but later acknowledged that "the District Attorney's response was improper." Although the trial court agreed to give a curative instruction, the jurors had already been excused for the day, and when they returned the following day, the court did not give an instruction. Kozachyn, however, never brought the matter to the court's attention. Under these circumstances, Kozachyn cannot now complain of the court's failure to instruct the jury on the matter.[56]

11. Michael Kozachyn asserts that the trial court erred in denying his motion to remain in the county jail while his appeal is pending. The court denied the motion, finding that "the Banks County Jail is an insecure and unsafe facility to house the Defendant during the appeals process." On appeal, Kozachyn generally argues that "he was not able to assist his attorney in his appeal . . . [or] articulate arguments which could have led to a reversal of his convictions." Thus, Kozachyn argues, because OCGA § 42-5-50 (c) required the court to grant his motion, his convictions should be reversed. We disagree.

Pretermitting whether the trial court erred in denying the motion, OCGA § 42-5-50 (c) does not provide for reversal of a conviction if a trial court refuses to keep a convicted defendant in the county jail, and we decline to create such a remedy.[57] Furthermore, notwithstanding Kozachyn's general assertion that the court's ruling prevented him from assisting in his appeal, he has not shown how his assistance would have resulted in a reversal.[58] Under these circumstances, we find no grounds for reversal.

12. Michael Kozachyn asserts that the trial court erred in: denying his motion for change of venue; denying his motion for mistrial after numerous members of the jury venire saw him in handcuffs; denying his *Batson* challenge to the State's strike of the only African-American on the venire; and allowing Lord to testify after he was removed from the State's witness list. Kozachyn's arguments in support of these asserted errors are identical to those raised by

---

[56] See *Hall v. State*, 259 Ga. 243, 244 (2) (378 SE2d 860) (1989). See also *Dennard*, supra at 456 (6).

[57] It is unclear why Kozachyn raised the trial court's ruling as error in his appellate brief rather than by motion to this Court. Although we expedite consideration of appeals in cases where a criminal defendant is incarcerated, see OCGA § 5-6-43 (c), a party is permitted to file a motion with the Court "whenever counsel wish the Court to take any action," and the Court generally "acts on motions quickly." Court of Appeals Rule 41 (a), (d).

[58] See *Demetrios v. State*, 246 Ga. App. 506, 511 (4) (541 SE2d 83) (2000).

Wilbanks, which we addressed and rejected above. Accordingly, we conclude that the arguments are without merit.

### Case No. A01A0920 Kozachyn v. State[59]

13. As with the other two defendants, Paul Kozachyn asserts that the trial court erred in denying his motion for severance. Kozachyn argues that the trial court should have severed the trial because most of the evidence implicated Wilbanks, and this evidence likely spilled over against him. Upon reviewing the evidence, we "do not believe it highly probable that [Paul Kozachyn] was convicted as the result of a spillover of the greater volume of evidence adduced solely against [Wilbanks]."[60] In addition to Vaughn's testimony describing Kozachyn's participation in the invasion, both Sam and Georgia Thurmond positively identified him at trial as the assailant with the shotgun. Thus, we find no abuse of discretion in the court's denial of the motion.[61]

14. During voir dire, potential jurors were asked whether they knew or had heard of Vaughn, who the district attorney stated "was originally a co-defendant in this case, . . . and he will be testifying. . . . He'll be receiving, after he testifies, a prison sentence of fifteen years, five years to be served in confinement." The trial court overruled a defense objection to the district attorney's disclosure of Vaughn's plea bargain. On appeal, Kozachyn argues that "[a] mistrial was absolutely necessary at that point to protect Appellant's Constitutional rights[,] and the denial of such mistrial is certainly grounds for reversal of his subsequent conviction." We find no error.

Despite Kozachyn's assertion in his brief, he has not shown on the record that he ever moved for a mistrial based on the statement. Accordingly, he has waived the right to assert that issue on appeal.[62] Furthermore, even if Kozachyn had raised the issue, "the prosecutor's reference did not violate OCGA § 24-3-52, which prohibits the confession of one joint offender from being admissible in evidence against another joint offender."[63] Finally, "[a]ny prejudice which might have resulted from the statement was nullified when [Kozachyn's] co-defendant, who had entered a plea of guilty, was

---

[59] We note initially that, in considering Paul Kozachyn's appeal, we are cognizant of the trial court's ruling that permitted him to "adopt all of the motions of all of the co-counsel." Notwithstanding the trial court's ruling, however, Paul Kozachyn has not established that, at trial, he raised many of the arguments he asserts on appeal. We will address each such circumstance in our review of the asserted errors.

[60] (Punctuation omitted.) *Henderson,* supra at 326.

[61] See id.

[62] See *Zehner v. State,* 241 Ga. App. 345, 346 (1) (525 SE2d 416) (1999).

[63] *Welch v. State,* 207 Ga. App. 27, 28 (5) (427 SE2d 22) (1992) (physical precedent only).

called as the state's witness; the jury learned nothing more by inference from the [prosecutor's] statement than it later learned directly from the state's witness himself."[64]

15. In two enumerations of error, Paul Kozachyn asserts that the trial court erred in admitting testimony concerning the Thurmonds' out-of-court identification of him as the intruder with the shotgun and in failing to hold an evidentiary hearing on his motion to suppress the out-of-court identification. According to Kozachyn, the Thurmonds were unable to identify him during a photographic lineup, and their identification of him at a bond hearing, in which he was the only defendant present, was impermissibly suggestive. However, Kozachyn has not cited to that portion of the record containing his motion to suppress and has not otherwise shown how he preserved these enumerated errors for appellate consideration. Indeed, in violation of Court of Appeals Rule 27 (a) (1), Kozachyn has not included a statement establishing how he preserved the error.

Furthermore, the transcript reveals that, on direct examination, when the prosecutor asked Sam Thurmond whether he was able to identify any of the intruders at a bond hearing, Kozachyn's counsel posed only the following objection: "If your Honor, please, that's — I would object to that at this point in time. What he testifies to what he knows at this point in time and what he did after the incident occurred and out of court — I mean, out of the area over there is certainly not admissible." The court overruled the objection.

We are unable to decipher the precise grounds raised by Kozachyn in his objection, and it appears that, on appeal, he may be relying on Wilbanks' motion in limine, and extensive argument before the trial court, seeking to exclude evidence of the victims' out-of-court identification of *Wilbanks*. Although the trial court permitted Paul Kozachyn to "adopt all of the motions" of his co-defendants, such ruling did not excuse Kozachyn from articulating, to the trial court, the specific reasons why the court should have excluded the victims' testimony concerning their out-of-court identification of him. Moreover, because Paul Kozachyn failed to raise these specific arguments, the trial court never had the opportunity to rule upon them. Accordingly, Kozachyn has waived consideration of these enumerated errors on appeal.[65]

16. In two separate enumerations of error, Paul Kozachyn asserts that the trial court erred in admitting the Thurmonds' trial testimony identifying him as one of the assailants and in denying

---

[64] *Boggus v. State*, 136 Ga. App. 917 (1) (222 SE2d 686) (1975).

[65] See *Williams v. State*, 244 Ga. App. 26, 27 (2) (535 SE2d 8) (2000); *Jackson v. State*, 222 Ga. App. 843, 845 (1) (476 SE2d 615) (1996).

him "the opportunity to voir dire [Sam Thurmond] on the basis of his identification of [Kozachyn]." Again, however, Kozachyn has not shown how he preserved these arguments for appellate review. Under these circumstances, Kozachyn has waived review of the asserted errors.[66]

17. When the State identified Lord as a witness three and one-half weeks before trial, the district attorney provided defendants with copies of Lord's criminal history, which showed that, on twenty-four occasions over thirty-four years, he had been charged with committing crimes throughout the country and that he had been convicted of most of the offenses. The court ordered the State to make a good faith effort to provide the defendants with certified copies of the convictions prior to trial. It appears, however, that the State only obtained a certified copy of one of Lord's many convictions. Paul Kozachyn asserts that the trial court erred in allowing Lord to testify because the State did not make a good faith effort to obtain copies of the other convictions.

In response to the defendants' objections, the State proffered the testimony of William Filson, an FBI special agent working on the matter for the State. Filson testified that he was able to obtain a copy of Lord's conviction on the most serious charge, kidnapping, and that he made "several phone calls," but was unable to obtain certified copies of the remaining convictions. According to Filson, many of the people he contacted about obtaining copies informed him that, because most of the convictions were from the 1960s, it was going to require a significant amount of time and research to locate the documentation. Filson was also informed that, due to the age of some of the convictions, the records had been destroyed. Based on this testimony, the trial court found that "Agent Filson's efforts were made in good faith" and ruled that Lord would be permitted to testify.

The trial court's "enforcement of its [discovery] directives is a matter committed primarily to the . . . court's sound exercise of discretion."[67] Considering Filson's testimony, we conclude that the court did not abuse its discretion in allowing Lord to testify.[68] Furthermore, in light of the fact that Lord was extensively cross-examined about his criminal history at trial, the trial court's decision did not constitute harmful error requiring reversal.[69]

18. Paul Kozachyn asserts that the trial court erred in admitting into evidence the tape-recorded conversation between Lord and

---

[66] See id.; Court of Appeals Rule 27 (a) (1).

[67] *Hightower v. State*, 259 Ga. 770, 771 (2) (386 SE2d 509) (1989).

[68] See id.

[69] See id.

Wilbanks. The transcript shows that, in admitting the recorded conversation, the trial court found

> that in this case the co-Defendants were still at large, that there was a conspiracy to commit this crime and a conspiracy to cover up the crime. The conspiracy to cover up the crime was still ongoing when Mr. Wilbanks made those statements to Mr. Lord. And I think because they were made during the conspiracy to conceal the crime they're admissible.

We agree with the trial court.

OCGA § 24-3-5 provides that "[a]fter the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." Under this Code section, "[t]he declarations of a conspirator, made during the course of a conspiracy, including the concealment stage, are admissible against co-conspirators."[70]

In this case, the evidence showed that the defendants were together prior to the home invasion, that they participated in the home invasion together, and that after leaving the Thurmonds' home, they stayed together to divide the proceeds of their criminal enterprise. "The concerted actions of [the co-defendants] were sufficient to establish a prima facie case of conspiracy to commit the [offenses]."[71] Furthermore, inasmuch as it is evident from the recorded conversation that the co-conspirators were intent on concealing the crime, the trial court correctly found that the concealment phase of the conspiracy was ongoing.[72] Under these circumstances, the recording was properly admitted into evidence.[73]

19. Paul Kozachyn asserts that the trial court erred in "repeatedly admitting improper character evidence." We review the trial court's rulings on these matters for abuse of discretion.[74]

(a) During the State's direct examination of Lord, the district attorney questioned Lord about his relationship with Wilbanks. The district attorney asked Lord: "Is [Wilbanks] comfortable around you, as far as talking about things with you?" Lord responded: "All thieves is comfortable around each other, yes." The trial court denied Kozachyn's motion for mistrial based on the response and his request for curative instructions. On appeal, Kozachyn asserts the court

---

[70] *Jones v. State*, 265 Ga. 84-85 (2) (453 SE2d 716) (1995).
[71] Id.
[72] See *Cromwell v. State*, 218 Ga. App. 481, 483 (2) (462 SE2d 388) (1995).
[73] See id.
[74] See *Davis v. State*, 272 Ga. 327, 334 (7) (538 SE2d 800) (2000); *Hansley v. State*, 267 Ga. 48, 49 (3) (472 SE2d 305) (1996).

erred because the response improperly placed Wilbanks' character into evidence and also improperly tainted the jury's view of him.

Inasmuch as Lord's comment did not concern Kozachyn, it is difficult to discern how the statement tainted the jury's view of him. Furthermore, an unresponsive answer, such as the one at issue here, "does not improperly place the defendant's character in issue."[75] Finally, even if Lord's answer did improperly imply that Wilbanks was a thief, the testimony was merely cumulative of other evidence already before the jury which established that, in 1985, Wilbanks pled guilty to armed robbery and burglary charges.[76]

(b) Paul Kozachyn also argues that the trial court erred in failing to grant a mistrial due to the State's failure to redact inadmissible character evidence from Lord's tape-recorded conversation before it was played to the jury. This enumeration of error is without merit.

Kozachyn generally argues the tape contained inadmissible character evidence, but has failed to identify which statements constitute such evidence or where they are located in the transcript. It appears that Kozachyn expects the Court to search the transcript for evidence supporting his assertion and to advance the appropriate legal argument on his behalf. However, "[i]t is a sound rule of appellate practice that the burden is always on the appellant in asserting error to show it affirmatively by the record. [Paul Kozachyn] has not met his burden and it is not the function of this court to cull the record on behalf of a party in search of instances of error."[77]

(c) Paul Kozachyn similarly argues that a limiting instruction given by the court after the tape was played to the jury was insufficient to remove the taint on his character. However, the transcript shows that, after the court instructed the jury, Kozachyn never raised the argument he raises here. Under these circumstances, Kozachyn's assertion that the trial court's instruction was insufficient has been waived.[78]

(d) During Sam Thurmond's direct examination, the prosecutor asked him how long he had known Wilbanks and if he knew whether Wilbanks lived in the area his whole life. Thurmond responded: "I don't know. I lost track of him. I went in the Navy when I was 19 and . . . I lost track of him. I read about him in the paper a few times." Wilbanks objected on the ground that the response improperly placed his character in evidence, and the trial court denied the motion. On

---

[75] Id.

[76] See *Malone v. State*, 219 Ga. App. 728, 730 (3) (466 SE2d 645) (1995) (purportedly improper character evidence deemed harmless because it was cumulative of other evidence before the jury).

[77] (Citations and punctuation omitted.) *Millis v. State*, 196 Ga. App. 799, 800-801 (4) (397 SE2d 71) (1990). See also Court of Appeals Rule 27 (c) (3) (i).

[78] See *Snow v. State*, 228 Ga. App. 649, 651 (3) (492 SE2d 564) (1997).

appeal, Paul Kozachyn merely argues that the trial court's ruling was error. Presumably, Kozachyn contends that the statement somehow tainted his character. Inasmuch as he never raised any objection before the trial court, he has waived any alleged error on appeal.[79]

(e) During the State's direct examination of Walker, Kozachyn's mother, the district attorney asked if she knew where Vaughn and Michael Kozachyn worked. Walker responded: "When they worked, it was sporadic. You have to understand, they were on drugs." Kozachyn objected to the statement and moved for a mistrial. Finding the answer unresponsive, the trial court denied the motion for mistrial, but stated that it would give a curative instruction if the defendants requested one. After the colloquy, the court adjourned for the day, and none of the defendants followed up with the court on the instruction. As stated above, "[a] party cannot during the trial ignore what he thinks to be an injustice, take his chance on a favorable verdict, and complain later."[80] Accordingly, Paul Kozachyn has waived appellate review of this assertion.

20. A few days after the home invasion, Sam Thurmond described his assailants to Deputy Sheriff Mickey Watkins, who created a report. The transcript reflects that, while cross-examining the Banks County Sheriff about the descriptions, defense counsel asked the sheriff about the contents of the report, but the trial court ruled the testimony was hearsay. On appeal, Kozachyn asserts that the ruling was erroneous. Inasmuch as the trial court correctly ruled that the testimony was inadmissible hearsay, we find no error.[81]

21. Paul Kozachyn asserts that the trial court erred in failing to grant a mistrial based on the district attorney's statement to Walker that he knew where she got the money to purchase her car. We addressed this argument above, and for the reasons discussed there, we conclude that Paul Kozachyn waived appellate review.

22. Finally, Paul Kozachyn asserts that the trial court erred in denying his motion for mistrial after numerous members of the jury venire saw him in handcuffs. For the reasons stated above, we conclude that this enumeration of error is without merit.

*Judgments affirmed. Johnson, P. J., and Ellington, J., concur.*

DECIDED AUGUST 17, 2001 — ▮

*Healy & Svoren, Timothy P. Healy,* for appellant (case no. A01A0918).
*William D. Healan III,* for appellant (case no. A01A0919).

---

[79] See *Williams,* supra at 27.
[80] (Punctuation omitted.) *Dennard,* supra at 456.
[81] See *Brown v. State,* 274 Ga. 31, 32 (1) (549 SE2d 107) (2001).

*Thomas M. Strickland*, for appellant (case no. A01A0920).
*Timothy G. Madison, District Attorney, Robin R. Riggs, Assistant District Attorney*, for appellee.